IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 18-cv-00756-PAB-MEH

LISA CALDERON,

     Plaintiff,

v.

CITY AND COUNTY OF DENVER,
MICHAEL HANCOCK,
PATRICK FIRMAN,
JESS VIGIL, and
ANDREA ALBO,

     Defendants.

_____

**ORDER**
_____

     This matter is before the Court on defendants' Motion to Dismiss Complaint

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) [Docket No. 21]. The Court has

jurisdiction pursuant to 28 U.S.C. § 1331.

## I. BACKGROUND

     This case arises out of the non-renewal of a city contract for the Transition from

Jail to Community ("TJC") program. Docket No. 1 at 3, 10-11, ¶¶ 10, 33, 35. The City

and County of Denver created the TJC program in 2007 to provide "transitional services

to adult Denver residents released from the Denver County Jail and Downtown

Detention Center." *Id.* at 3, ¶ 13. From its inception until December 2017, the TJC

program was administered by the Community Reentry Program ("CRP") under a series

of one-year contracts between the City and CRP that were renewed automatically each

year, with the exception of 2011 when the City issued a Request for Proposal ("RFP") for the TJC program. *Id.* at 3-4, ¶¶ 14, 15, 17.[1] Plaintiff Lisa Calderón, a Latina/African-American woman, served on the City committee that created the TJC program. *Id.* at 3-4, ¶¶ 11, 15. Between 2007 and December 2017, plaintiff led the program as Executive Director of CRP. *Id.*

In June and August 2017, plaintiff spoke publicly and to defendant Michael Hancock, the mayor of Denver, on issues related to race discrimination in the sheriff's department and the management of the city jail. *See id.* at 5-6, ¶¶ 23-24. In June 2017, officials in various city offices, including the mayor's office, the city attorney's office, the Department of Safety, and the Sheriff Department, discussed terminating CRP's TJC contract. *Id.* at 7, ¶ 28. Defendant Jess Vigil, who at all times relevant to this case was serving the Deputy Manager of Public Safety for the City of Denver, spoke to other officials about "terminating the CRP contract because of [plaintiff's] activism and criticism of City officials." *Id.* at 7, ¶ 29. During a meeting on August 14, 2017, defendant Hancock stated that he was "'personally offended' and 'stung' by plaintiff's criticisms of his and Executive Director O'Malley's treatment of African American staff." *Id.*, ¶ 26.

In July 2017, after six years of automatically renewing CRP's TJC contract, the City issued a formal RFP for the TJC program. *Id.* at 4, ¶ 18. Plaintiff was not included

---

[1]According to plaintiff's allegations and the TJC contract submitted by defendants in conjunction with their motion to dismiss, the contract was entered into by the Colorado Nonprofit Development Center ("CNDC"), CRP's fiscal agent. *See* Docket No. 1 at 4, ¶ 16 (alleging that the "City contracted with the CRP, though its financial agent"); Docket No. 21-1 at 1 (contract).

on the distribution list for the RFP, *id.* at 8, ¶ 32(b), and employees of the sheriff's department actively recruited organizations other than CRP to participate in the bidding process. *Id.*, ¶ 32(c). Albus Brooks, President of the Denver City Council, and former Denver Human Services employee Regina Huerter told the Crime Prevention and Control Commission and the Denver City Council that "CRP had failed in its performance of the TJC contract." *Id.* at 9-10, ¶ 32. After learning about the RFP from a concerned city employee, plaintiff applied for renewal of the TJC contract on behalf of CRP and its fiscal agent. *Id.* at 4, ¶ 19. Plaintiff was the only woman to respond to the RFP – all of the other contractors were led by men. *Id.* at 11, ¶ 37.

The process for reviewing applications for a City contract such as the TJC contract involves four steps. First, the "Crime Prevention and Control Commission reviews the applications and makes recommendations to the Executive Director of Denver Human Services." *Id.* at 4, ¶ 20. Second, "the Executive Director reviews and rubberstamps the recommendation to the Mayor." *Id.* Third, "the Mayor selects the contractor and sends a proposed ordinance to the City Council." *Id.* Finally, the City Council "votes to accept the proposed ordinance, with little review or question." *Id.* The mayor is the final decision maker in the contracting process. *Id.*, ¶ 21.

On October 18, 2017, the review committee recommended that a coalition of organizations, including Servicios De La Raza, Urban League of Metro Denver, and Colorado Coalition for the Homeless, be awarded the TJC contract. *Id.* at 5, 10, ¶¶ 22, 33. Plaintiff warned city officials that the organizations recommended for the contract had a pattern and practice of being hostile toward women and thus requiring CRP to

collaborate with those organizations in transitioning the TJC program would put staff members at risk of harm. *Id.* at 12, ¶ 40. City Council members Debbie Ortega and Rafael Espinoza expressed more general concerns about the RFP process. *Id.* at 10-11, ¶ 34. For example, Ms. Ortega questioned whether the TJC contract needed to be put out for bid at all and noted that the contract had been treated differently from another city contract that had been in place since 2003. *Id.* Mr. Espinoza stated that the city's "advancement of the contract did not 'pass the smell test'" and indicated that putting the contract up for bid would be a good way to retaliate against plaintiff. *Id.*

Following approval of the committee's recommendation by Denver Human Services director Don Mares and defendant Hancock, the TJC contract was formally awarded to the recommended coalition of organizations on March 19, 2018. *Id.* at 10, ¶ 33.

Plaintiff initiated this lawsuit on April 2, 2018, alleging claims under 42 U.S.C. § 1983 for First Amendment retaliation and violation of her equal protection and due process rights under the Fourteenth Amendment. Docket No. 1 at 13-15. Plaintiff asserts that she and CRP have "suffered economic losses from the City's refusal to renew the CRP's contract . . ., including but not limited to lost wages and benefits and lost reputation, as well as emotional and physical suffering." *Id.* at 13. She seeks actual and punitive damages and an award of reasonable attorney's fees and costs. *Id.* at 15. On June 18, 2018, defendants moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Docket No. 21. Plaintiff filed a response to the motion on July 22, 2018, Docket No. 29, to which defendants replied on August 6, 2018.

Docket No. 30.

## II.  LEGAL STANDARD

Defendants move to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Dismissal pursuant to Rule 12(b)(1) is appropriate if the Court lacks subject matter jurisdiction over claims for relief asserted in the complaint.  Rule 12(b)(1) challenges are generally presented in one of two forms: "[t]he moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests."  *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004) (quoting *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003)).  When reviewing the factual basis on which subject matter jurisdiction rests, the district court does not presume the truthfulness of the complaint and "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) (citations omitted). Consideration of evidence outside the pleadings does not convert the motion to a Rule 56 motion.  *Id.*

In contrast to motions to dismiss brought under Fed. R. Civ. P. 12(b)(1), a motion under Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of the complaint.  To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (alteration marks omitted).

## III.  ANALYSIS

Defendants move to dismiss this case on the ground that plaintiff's claims are barred by the prudential rule against third-party standing.  *See* Docket No. 21 at 6-9. Specifically, they contend that plaintiff's constitutional claims are derivative of claims belonging to CRP and its fiscal agent as the entities denied the TJC contract.  Docket No. 21 at 6-7; Docket No. 30 at 7.  Plaintiff responds that her claims satisfy prudential standing rules because they are based on direct and personal injuries, including (1) violation of her constitutional rights, (2) economic damages, and (3) mental suffering, humiliation, and loss of reputation.  Docket No. 29 at 4.

The standing inquiry requires the Court to consider "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Constitutional standing requires a plaintiff to show (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) a causal connection between the injury and the challenged action of the defendant; and (3) a likelihood "that the injury will be redressed by a favorable decision." *Collins v. Daniels*, 916 F.3d 1302, 1312 (10th Cir. 2019) (internal quotation marks omitted). Defendants in this case make no argument that plaintiff's alleged injuries are insufficient to establish constitutional standing. However, a plaintiff who meets the requirements for Article III standing must also satisfy prudential standing rules. Pursuant to those rules, a litigant must generally "assert [her] own legal rights and cannot rest [her] claim to relief on the legal rights . . . of third parties." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017) (internal quotation marks omitted). This rule is based on the assumption that "the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with necessary zeal and appropriate presentation." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). Additionally, "[i]t represents a healthy concern that if the claim is brought by someone other than one at whom the constitutional protection is aimed, the courts might be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Id.* (internal citations and quotation marks omitted).

In their briefing, the parties rely on one iteration of the rule against third-party

standing under which "a stockholder cannot maintain a personal action against a third party for harm caused to the corporation." *Guides, Ltd. v. Yarmouth Group Prop. Mgmt., Inc.*, 295 F.3d 1065, 1072 (10th Cir. 2002). In *Guides*, the Tenth Circuit applied this rule to hold that a president and sole shareholder of a corporation lacked standing to assert claims under 42 U.S.C. §§ 1981 and 1982 based on the defendants' refusal to contract with and lease property to the corporation. *See id.* at 1071-73. Although the plaintiff asserted that the defendants had discriminated against plaintiff on the basis of her race, the Court concluded that the corporation was the "direct victim of the alleged discrimination" because it was the "party seeking to contract with the defendants and to lease property." *Id.* at 1072. The court acknowledged an exception to the shareholder standing rule "where the actions of the third party that injure the corporation also cause injury to the shareholder which is unique to himself or herself." *Id.* However, the court determined that this exception did not apply because the plaintiff's claim for emotional distress "arose from the failure of the defendants to contract with or lease to [the corporation]" and was therefore derivative of claims belonging to the corporation. *Id.* at 1072-73. Likewise, in *Grubbs v. Bailes*, 445 F.3d 1275 (10th Cir. 2006), the Tenth Circuit considered whether prudential standing rules barred a shareholder from asserting an equal protection claim against the local sheriff's office based on its failure to enforce trespass laws to protect the shareholder's property. *Id.* at 1276, 1280. The property in question technically belonged to the corporation, which had been "formed to acquire and hold certain lakeside land for the use of the shareholders." *Id.* at 1277. Nevertheless, the Tenth Circuit, applying an exception to the shareholder standing rule

for shareholders with a "direct, personal interest in a cause of action," held that the shareholder was entitled to assert an equal protection claim on his own behalf based on his distinct, legally recognized possessory interest in the property, namely, an individual leasehold in his particular cabin site and a joint interest in the common areas. *Id.* at 1280-81 (emphasis omitted). These cases illustrate that the shareholder standing rule bars claims based on injuries suffered solely as a consequence of injuries sustained by the corporation.

While both sides rely on cases applying the shareholder standing rule, neither addresses whether it is appropriate to apply the rule in cases, such as this one, where the plaintiff is an employee rather than a shareholder of the corporation.[2] However, even assuming the shareholder standing rule is not directly applicable, the rule is a variation of the broader principle that a plaintiff may not "rest his claim to relief on the legal rights or interests of third parties." *Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990) (internal quotation marks omitted) (noting that the shareholder standing rule is "related" to the broader prudential rule against third-party standing); *see also Lawson v. BNSF Ry. Co.*, 2015 WL 6442741, at *6 (E.D. Wash. Oct. 23, 2015) ("Surely if an owner and shareholder cannot sue for injuries suffered by a corporation neither can an employee, even if he is a corporate officer."). At least two circuits have relied on third-party standing rules to hold that an employee may not bring claims that are derivative of those belonging to her employer. In *Pagan v. Calderon*,

---

[2]Neither the allegations in the complaint nor the language of the TJC contract specify what type of entities CRP and CNDC are. However, the Court agrees with defendants that this fact is immaterial. The critical point for purposes of the standing inquiry is that plaintiff did not enter into a contract with the city on her own behalf.

448 F.3d 16 (2006), the First Circuit held that a corporate consultant lacked standing to assert First Amendment, due process, and equal protection claims based on allegations that the governor of Puerto Rico had "improperly influenced the decision of a government lender to reject a loan" sought by the corporation. *Id.* at 23, 30. Citing the Tenth Circuit's decision in *Guides*, the court held that the plaintiff's asserted injuries – the fact that the defendant's conduct "was driven by political animus aimed squarely at him" and his loss of income resulting from the corporation's economic downfall – were not sufficient to overcome the rule against third-party standing. *Id.* at 30. Similarly, in *Duran v. City of Corpus Christi*, 240 F. App'x 639 (5th Cir. 2007) (unpublished), an employee of a city contractor was denied standing to assert a First Amendment retaliation claim based on the city's decision not to renew his employer's contract to provide third-party claims administration and accounting services in connection with the city's health insurance program. *Id.* at 639, 642-43. The court reasoned that the plaintiff's alleged injury – his loss of a portion of the administrative fees that would have been paid to his employer had the city contract been renewed – was "only a by-product of Entrust's failure to receive the contract renewal itself" and therefore insufficiently direct to satisfy prudential standing requirements. *Id.* at 643.

Both *Pagan* and *Duran* support a conclusion that plaintiff's allegations of economic injury – lost wages and benefits – stemming from defendants' decision not to renew CRP's TJC contract are insufficient to confer standing. Plaintiff's factual allegations and the language of the TJC contract demonstrate that it was CNDC, the fiscal agent of CRP, and not plaintiff who contracted with the city over the TJC program.

*See* Docket No. 1 at 4, ¶¶ 16, 19 (alleging that "[t]he City contracted with the CRP,

through its financial agent" and that plaintiff responded to the 2017 RFP "on behalf of

CRP and its fiscal agent," seeking "renewal of the contract CRP had held for the

previous 10 years"); Docket No. 21-1 at 1 ("THIS AGREEMENT is made between the

CITY AND COUNTY OF DENVER . . . and the COLORADO NONPROFIT

DEVELOPMENT CE[N]TER . . . ."); Docket No. 21-2 at 1 ("THIS AMENDATORY

AGREEMENT is made between the CITY AND COUNTY OF DENVER . . . and

COLORADO NONPROFIT DEVELOPMENT CENTER . . . .").[3]  Accordingly, any

economic injury suffered by plaintiff as a result of the nonrenewal was derivative of

CNDC's loss of the TJC contract and therefore insufficient to support standing.  *See*

*Garzes v. Lopez*, 281 F. App'x 323, 324-25 (5th Cir. 2008) (unpublished) (employee's

loss of "a significant amount of potential commissions" as a result of termination of

---

[3]While defendants contend that the Court may consider materials outside of the
pleadings in resolving a motion brought under Fed. R. Civ. P. 12(b)(1), Docket No. 21 at
5 n.3, the Tenth Circuit has not decided whether a motion to dismiss on prudential
standing grounds arises under Rule 12(b)(1) or 12(b)(6).  *VR Acquisitions, LLC v.
Wasatch Cty.*, 853 F.3d 1142, 1146 n.4 (10th Cir. 2017) ("assum[ing] without deciding
that it is appropriate to dismiss a complaint under Rule 12(b)(6), rather than Rule
12(b)(1), when the plaintiff lacks prudential standing"); *Hartnett v. Farm Serv. Agency,
U.S. Dep't of Agric.*, 2018 WL 2971692, at *4 (D. Kan. June 12, 2018) ("The Tenth
Circuit has not decided whether it is appropriate to dismiss a complaint under Rule
12(b)(6), rather than Rule 12(b)(1), when the plaintiff lacks prudential standing.").  Even
under Rule 12(b)(6), however, a court may consider documents outside of the
pleadings when the documents are "mentioned in the complaint," "central to [the]
claims," and not challenged as inauthentic.  *Toone v. Wells Fargo Bank, N.A.*, 716 F.3d
516, 521 (10th Cir. 2013).  The Court finds that these requirements are met as to the
TJC contracts attached to defendants' motion to dismiss.  *See* Docket Nos. 21-1, 21-2.
Not only are the contracts referred to in the complaint and central to plaintiff's
allegations of injury, *see* Docket No. 1 at 4, ¶¶ 16-17, but plaintiff also concedes their
authenticity by citing the contracts in response to defendants' motion to dismiss.  *See*
Docket No. 29 at 2, 3 n.2.

employer's contract was insufficiently direct to confer standing to employee to bring First Amendment retaliation and conspiracy claims); *Duran*, 240 F. App'x at 643 (employee's economic injury stemming from nonrenewal of city contract with employer "was only a by-product of Entrust's failure to receive the contract renewal itself" and therefore insufficient to support standing); *Pagan*, 448 F.3d at 30 (plaintiff's allegation of economic harm stemming from company's loss of financing was insufficient to confer standing); *cf. Guides*, 295 F.3d at 1072 (sole shareholder lacked standing to assert claims based on defendant's refusal to contract with corporation); *Potthoff v. Morin*, 245 F.3d 710, 715-16 (8th Cir. 2001) (sole shareholder lacked standing to assert free speech and due process rights based on financial injuries suffered as a result of termination of corporation's lease agreement); *Brannon v. Murray*, 2006 WL 8432850, at *3-4 (S.D. Ga. June 19, 2006) (member of limited liability company lacked standing to assert § 1983 claims based on economic loss deriving solely from his membership in the LLC); *Finley v. Takisaki*, 2006 WL 1169794, at *3 (W.D. Wash. Apr. 28, 2006) (plaintiffs' "personal economic loss as a result of Defendants' wrongdoing" was insufficient to create standing because the loss derived from the plaintiffs' membership in the LLC).

In an effort to avoid application of the rule against third-party standing, plaintiff contends that her allegations of emotional and reputational harm demonstrate injury separate and distinct from CRP/CNDC's. *See* Docket No. 29 at 4. But the complaint does not suggest – and plaintiff does not argue – that she sustained these injuries as a

result of anything other than the nonrenewal of CNDC's contract.[4]  As such, plaintiff's

reputational and emotional injuries do not give her standing to sue on her own behalf.

*See Guides*, 295 F.3d at 1072-73 (holding that, because the plaintiff's emotional

"distress arose from the failure of the defendants to contract with or lease to" the

corporation, the plaintiff's claim was derivative of the corporation's and she lacked

standing to sue on her own behalf); *Pagan*, 448 F.3d at 30 ("It is not enough for the

agent to allege an injury that is qualitatively different from that suffered by the principal;

rather, the agent must allege an injury that does not derive from the injury to the

principal."); *Audio Odyssey, Ltd. v. Brenton First Nat'l Bank*, 245 F.3d 721, 729 (8th Cir.

2001) (concluding that shareholder's "emotional and reputational injuries stemming

from the replevin of the Bank's collateral" were insufficient to confer standing because,

although "a sole shareholder may suffer shame and humiliation when the corporation is

destroyed, . . . an 'emotional injury' exception would swallow the rule against

shareholder standing"), *opinion vacated and subsequently reinstated by* 286 F.3d 498

(8th Cir. 2002) (en banc); *Kounitz v. Slaatten*, 901 F. Supp. 650, 654-55 (S.D.N.Y.

1995) (holding that allegations of emotional distress by husband of wife who was fired,

allegedly in retaliation for husband's exercise of his free speech rights, did not

demonstrate an injury sufficient to confer standing).  *But see Sorrano's Gasco, Inc. v.*

*Morgan*, 874 F.2d 1310, 1319 (9th Cir. 1989) (holding that plaintiff's allegations of

---

[4]Plaintiff alleges that defendants "attempted to discredit [her] by spreading the false and malicious rumor that [she] had spoken out about the demotion of an African American Sheriff Division Chief because she was having an affair with him."  Docket No. 1 at 7, 13, ¶¶ 31, 42.  However, it is not clear from the complaint how this conduct relates to plaintiff's constitutional claims or her allegations of reputational and emotional injury.

mental and emotional distress were sufficient to establish a personal injury distinct from the corporation's); *Wright-Upshaw v. Nelson*, 2014 WL 692870, at *5 (E.D.N.Y. Feb. 19, 2014) (citing cases for the proposition that "[a] direct and independent claim for personal emotional damages can satisfy the constitutional standing requirement, even if the alleged emotional injury arose from the same conduct as the corporate injuries" (internal quotation marks omitted)).[5]

Plaintiff also argues that she has suffered distinct, personal injury because defendants "violated her constitutional rights when it terminated its Community Reentry Project and refused to renew the contract with the CDNC." Docket No. 29 at 4. The Court is not aware of a Tenth Circuit case directly addressing whether the rule against third-party standing applies to a plaintiff seeking to vindicate her own constitutional rights. In *Guides*, the plaintiff was asserting claims under 42 U.S.C. §§ 1981 and 1982, which bar interference with a person's right to "make and enforce contracts" and "inherit, purchase, lease, sell, hold, and convey real and personal property." Thus, although the defendant's discriminatory conduct was motivated by racial animus toward the plaintiff, the rights being asserted clearly belonged to the corporation as the contracting party. *See Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479-80 (2006) (holding that "a plaintiff cannot state a claim under § 1981 unless he has (or would

---

[5]The Court finds, in the alternative, that plaintiff's allegations of emotional and reputational harm are too conclusory to establish a distinct, personal injury. *See Robertson v. Colvin*, 564 F. App'x 931, 934 (10th Cir. 2014) (unpublished) (finding plaintiff's allegation of reputational injury "too abstract and speculative to satisfy the requirements of Article III"); *In re United Telecomms., Inc., Sec. Litig.*, 1993 WL 100202, at *2 (D. Kan. Mar. 4, 1993) (finding allegation that company had "suffered injury to its credibility and ability to conduct business" conclusory and unsupported by pleaded facts showing that the company "ha[d] indeed sustained injury").

have) rights under the existing (or proposed) contract that he wishes to 'make and enforce'"). The same cannot be said in this case. Here, plaintiff is asserting a violation of her rights under the First and Fourteenth Amendments. These constitutional provisions have a broader reach than §§ 1981 and 1982 – one that is not limited to the right to contract or lease and convey property. The Court is therefore faced with a situation, distinguishable from *Guides*, in which the party asserting the abstract constitutional or statutory right is different from the party who has suffered the cognizable economic injury.[6]

Courts faced with similar circumstances have applied the rule against third-party standing in different ways. Some have held that the party asserting the abstract constitutional right has standing to bring claims on his or her own behalf. *See, e.g.*, *Rasche v. Village of Beecher*, 336 F.3d 588, 591 n.1, 595 n.8 (7th Cir. 2003) (finding "no reason to disturb" the district court's holding that a business owner had standing to assert First Amendment claims on her own behalf based on injury to the corporation where the plaintiff was asserting that the defendants had "retaliated against *her* First Amendment rights"); *Soranno's Gasco, Inc.*, 874 F.2d at 1318-19 (holding that business owner had standing to assert First Amendment retaliation claims on his own behalf because the "first amendment rights that were allegedly violated belong[ed] to Mr. Soranno, not the corporation"); *Belt v. Marion Cmty. Unit Sch., Dist. No. 2*, 2006 WL

_____

[6]The Court need not decide whether a claim for nominal damages would establish injury sufficient to overcome the rule against third-party standing. Plaintiff does not raise the argument, and the allegations in the complaint do not suggest that she is seeking nominal damages. *See Potthoff*, 245 F.3d at 714, 716 (resolving standing issue in defendant's favor, where plaintiff had "not pled any damages other than a derivative claim for compensatory damages").

839434, at *4 (S.D. Ill. Mar. 28, 2006) (suggesting that the plaintiff had standing to assert a First Amendment retaliation claim based on threats made against her spouse in retaliation for the plaintiff's exercise of her First Amendment rights); *see also Caravella v. City of New York*, 79 F. App'x 452, 453 (2d Cir. 2003) (unpublished summary order) (holding that a plaintiff lacked standing to bring civil rights action under 42 U.S.C. § 1983 based on injuries indirectly caused by harm to corporation where the plaintiff had "not alleged that his constitutional rights ha[d] been violated"); *Eichwald v. Griffith*, 2008 WL 11451415, at *3-5, *4 n.2 (D.N.M. July 16, 2008) (holding that a father lacked standing to assert a First Amendment retaliation claim on his son's behalf, but noting that it might have been a "closer case" if the father had brought the "action on his own behalf, alleging that the adverse actions taken against his son were aimed at chilling *his* speech"). Other courts have reached the opposite conclusion, treating the person asserting the abstract right as the "third party" for purposes of the prudential rule against third-party standing. *See, e.g.*, *Duran*, 240 F. App'x at 642-43 (adopting First Circuit's reasoning that "the standing inquiry turns on the plaintiff's injury, not the defendant's motive and the fact that the animus toward the agent sparked mistreatment of the principal does not create an exception to the rule that an agent's section 1983 claim can flourish only if he alleges that he personally suffered a direct, nonderivative injury" (internal quotation marks, bracket, and ellipsis omitted)); *Pagan*, 448 F.3d at 30 (rejecting corporate consultant's argument that he had standing to assert a First Amendment retaliation claim based on the fact that the injuries sustained by the corporation were inflicted as a result of "political animus aimed squarely at him"); *Thompson v. Adams*, 268 F.3d 609, 613-14 (8th Cir. 2001) (holding that a plaintiff

whose husband was fired in retaliation for her First Amendment activity lacked standing to assert her own First Amendment claims because there was no showing of any act that had an actual or inhibitory effect on her speech); *Horstkoetter v. Dep't of Public Safety*, 159 F.3d 1265, 1279 (10th Cir. 1998) (holding that wives of highway patrol officers threatened with termination as a result of wives' First Amendment activities lacked standing to "mount a separate and independent First Amendment challenge" because there was no possibility that they would suffer direct injury).

The Court is persuaded by the latter approach. As the First Circuit explained in *Pagan*, "the standing inquiry turns on the plaintiff's injury, not the defendant's motive." *Pagan*, 448 F.3d at 30. Thus, the fact that defendants' conduct in this case was allegedly motivated by animus toward plaintiff's gender and exercise of her First Amendment rights does not, without more, establish a personal, non-derivative injury sufficient to allow plaintiff to sue on her own behalf.[7] This conclusion accords with the principle that a court may not "assum[e] jurisdiction based upon a hypothetical legal injury." *Day v. Bond*, 500 F.3d 1127, 1137-38 (10th Cir. 2007); *see also Potthoff v. Morin*, 245 F.3d 710, 718 (8th Cir. 2001) ("[I]t is well established that a claim based merely upon the deprivation of an abstract constitutional right is not justiciable unless a legally protectible interest is at stake." (citing *Memphis Community School District v. Stachura*, 477 U.S. 299, 310 (1986)). It is also consistent with the Tenth Circuit's holding in *Horstkoetter* that the wives who engaged in the First Amendment activities

---

[7]To the extent plaintiff could have established non-derivative injury based on an actual or inhibitory effect on her speech, *see Thompson*, 268 F.3d at 614, plaintiff has not alleged any facts indicating that she was deterred from speaking as a result of defendants' conduct.

lacked standing to assert constitutional claims on their own behalf. *See* 159 F.3d at 1279 (holding that, because the "state [was] not regulating their speech, the wives [of the highway patrol officers did] not have standing to mount a separate and independent First Amendment challenge to the policy").[8]

Plaintiff's final argument is that, notwithstanding the shareholder standing rule, she is entitled to assert her constitutional claims as an employee of the City of Denver. Docket No. 29 at 6. This argument fails. First, plaintiff's assertion that she is a city employee is not supported by allegations in the complaint. Instead, she relies in large part on a declaration, submitted in response to defendants' motion, in which she asserts additional facts in an effort to establish that the City of Denver controlled the terms and conditions of her employment. *See* Docket No. 29 at 6-7; *see also* Docket No. 29-1 (plaintiff's declaration). To the extent that issues of prudential standing are properly resolved under Fed. R. Civ. P. 12(b)(6) rather than Rule 12(b)(1), *see VR Acquisition, LLC*, 853 F.3d at 1146 n.4 (citing cases holding that "dismissals under Rule 12(b)(6) for lack of prudential standing are appropriate"), the Court may not rely on plaintiff's declaration in determining whether defendants' request for dismissal should be granted. *See Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991) ("The court's

---

[8]Although the Tenth Circuit subsequently concluded that the wives had standing to assert the "same claims as their husbands raised" based on the fact that they would be indirectly injured by their husbands' loss of income, *Horstkoetter*, 159 F.3d at 1279, the Court interprets this part of the opinion as establishing that the plaintiffs could assert third-party claims on behalf of their husbands. *See id.* (stating that the "wives' claims would in essence be that the state cannot constitutionally discipline their husbands for having political signs on their residential property, the same claim raised by their husbands").

function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."). Looking solely to the complaint and the language of the TJC contract, plaintiff has not established that she was a city employee.

Even if Rule 12(b)(1) were the appropriate mechanism by which to resolve issues of prudential standing, plaintiff's assertion that she was a city employee is belied by the objective evidence in the record. The TJC contract specifically states:

> [CNDC] is an independent contractor retained to perform professional or technical services for limited periods of time. Neither the Contractor nor any of its employees are employees or officers of the City under Chapter 18 of the Denver Revised Municipal Code, or for any purpose whatsoever.

Docket No. 21-1 at 4, ¶ 7; *see also id.* at 21-23 (discussing CNDC's oversight responsibilities with respect to CRP staff); Docket No. 21-2 at 1 (indicating that "Community Reentry Project" was merely the fictitious business name of CNDC); Docket No. 21-2 at 5-7 (listing CNDC's responsibilities regarding staff members). Finally, even assuming the evidence supported a finding that plaintiff was a city employee, plaintiff does not explain how that fact would alter the standing analysis in this case. As defendants point out, plaintiff is still seeking to assert claims based on defendants' failure to renew a contract with CNDC. *See* Docket No. 30 at 5 n.3.[9]

---

[9]Contrary to plaintiff's assertion, *see* Docket No. 29 at 6, this case is not analogous to *Klosowski v. Ledesma*, 2016 WL 627731 (E.D. Mich. Feb. 17, 2016). There, the plaintiff was asserting a First Amendment claim based on the defendants' termination of their employment relationship with *the plaintiff*. *See id.* at *6. The court made a point of distinguishing cases such as *Garzes* and *Potthoff* on the ground that, unlike in those cases, the plaintiff was "asserting his own injury in fact – that he himself was not selected as a bridge tender in retaliation for his protected speech." *Id.* at *5-6.

For the foregoing reasons, the Court finds that plaintiff's First and Fourteenth Amendment claims are derivative of claims belonging to CRP/CNDC. Because plaintiff seeks only to assert her own rights and not those of CRP/CNDC, *see* Docket No. 1 at 14 (asserting that defendants violated *plaintiff's* rights by not renewing the TJC contract), her claims will be dismissed for lack of prudential standing. *See Hodak v. City of St. Peters*, 535 F.3d 899, 906 (8th Cir. 2008) (stating that a litigant seeking to assert claims on behalf of a third party must actually assert the rights of the third party).[10]

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendants' Motion to Dismiss Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) [Docket No. 21] is **GRANTED**. It is further

**ORDERED** that plaintiff's complaint [Docket No. 1] is dismissed without prejudice for lack of prudential standing. It is further

**ORDERED** that, within 14 days of the entry of this Order, defendants may have their costs by filing a Bill of Costs with the Clerk of the Court. It is further

**ORDERED** that this case is closed.

---

[10]Dismissal will be without prejudice. *See Brumfiel v. U.S. Bank*, 618 F. App'x 933, 935-38 (10th Cir. 2015) (unpublished) (affirming dismissal without prejudice for lack of prudential standing without addressing whether dismissal should have been with or without prejudice).

DATED September 17, 2019.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
Chief United States District Judge