## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action Number: 18-cv-00756-PAB-MEH

**LISA CALDERÓN**,
     Plaintiff,

v.

**CITY AND COUNTY OF DENVER,**
**MICHAEL HANCOCK,**
**PATRICK FIRMAN,**
**JESS VIGIL**,
**ANDREA ALBO,** and
**REGINA HUERTER**,
     Defendants.

---

## AMENDED COMPLAINT

---

     Plaintiff, Lisa Calderón, by and through his undersigned attorney, hereby files the

following amended complaint against Defendants City and County of Denver, Michael Hancock,

Patrick Firman, Jess Vigil, Andrea Albo and Regina Huerter:

### PARTIES

     1.    Complainant Lisa Calderón ("Ms. Calderón") is an individual and a resident of

Colorado.

     2.    Defendant City and County of Denver ("City") is a municipality/county duly

constituted under the laws of Colorado, with its principal offices located at the City and County

Building, 1437 Bannock St., Denver, CO 80202.

     3.    Defendant Hancock ("Hancock") is an individual and a resident of Colorado, and,

at all times relevant to this complaint, was the Mayor of the City of Denver, whose office is

located at 1437 Bannock St., #350, Denver, CO 80202. Hancock is sued in his individual and official capacities.

4.     Defendant Patrick Firman ("Firman") is an individual and a resident of Colorado, and at all times relevant to this complaint, was the Sheriff of the City and County of Denver, and as such, is the head of the Denver Sheriff Department, whose headquarter offices are located at 490 W. Colfax Avenue, Denver, CO 80204.  Firman is sued in his individual and official capacities.

5.     Defendant Jess Vigil ("Vigil") is an individual and a resident of Colorado, and, at all times relevant to this complaint, was the Deputy Manager of Public Safety in the Department of Public Safety for the City of Denver, which is located at 1331 Cherokee Street, Denver, CO 80204.  Vigil is sued in his individual and official capacities.

6.     Defendants Andrea Albo ("Albo") is an individual and a resident of Colorado, and, at all times relevant to this complaint, was the Chief of Staff to the Sheriff at the Denver Sheriff Department, whose headquarter offices are located at 490 W. Colfax Avenue, Denver, CO 80204.  Albo is sued in her individual and official capacities.

7.     Defendant Regina Huerter ("Huerter") is an individual and a resident of Colorado, and, at all times relevant to this complaint, was Executive Director of the Office of Behavioral Health Strategies in the Denver Department of Public Health & Environment and managed the Crime Prevention and Control Commission for the City of Denver, which is located at 200 W 14th Ave 80204. Huerter is sued in her individual and official capacities.

## JURISDICTION

8.     The purpose of this action is to redress and restrain acts or practices by

2

Defendants that federal law deems unlawful.

9.    The Court has original jurisdiction over the subject matter of these claims

pursuant to 28 U.S.C. §1331, and 42 U.S.C. §1983.

10.    Venue for this action properly lies in the District of Colorado pursuant to 28

U.S.C. §1391(b).

## NATURE OF THIS ACTION

11.    This case arises out of the actions of Defendants, individually and in concert, (i)

in depriving plaintiff Calderón of her rights under the First Amendment by failing to renew

and/or award her City contract in retaliation for her speaking out about matters of public concern,

and placing unconstitutional conditions on the receipt of that contract; and (ii) discriminating

against her on the basis of her gender in violation of the Fourteenth Amendment, and retaliating

against her for opposing discrimination.

## FACTUAL ALLEGATIONS

*Background*

12.    Ms. Calderón is a Latina/African American female who was the Executive

Director of the Community Reentry Program ("CRP") and was the co-chair of the Colorado

Latino Forum ("CLF").

13.    The Colorado Latino Forum is an organization dedicated to increasing the

political, social, educational and economic strength of Latinas and Latinos.

14.     The City created the Community Reentry Project ('CRP") in 2007 to provide services including transitional services to adult Denver residents released from the Denver County Jail and Downtown Detention Center.

15.     The City required CRP to incorporate the Transition from Jail to Community (TJC) model developed by the National Institute of Corrections and Urban Institute.

16.     As a program created by the City, CRP was not incorporated and had no legal status of its own. The CRP was completely controlled by the City.  The City required CRP staff to use city email, servers, data and phone systems, equipment, furniture, office space and reporting procedures.  CRP staff were required to attend city trainings, complete multiple city clearance processes, and were issued City access badges. For years, CRP was housed under the City's Department of Safety and was required to fully operate under its authority.

17.     Defendant Huerter, as Executive Director Office of Behavioral Health Strategies and manager of the Crime Prevention and Control Commission (CPCC), oversaw Ms. Calderon's work, functionally acting as her supervisor from 2007 until December of 2017. For example, Huerter's approval was required for staff hirings, salaries, security authorizations, budget requests, equipment, office location, programming, and data management.

18.     Because the City could not directly run a non-profit community-based group, the City designated a fiscal entity for the CRP.  Over the years, the City designated three different fiscal agents for CRP, the last being Colorado Nonprofit Development Center ("CNDC").

19.     According to its website,

"CNDC provides fiscal sponsorship to select charitable organizations in Colorado.

How Fiscal Sponsorship Works

4

Fiscal Sponsorship is a formal arrangement that allows charitable
organizations to operate under the umbrella of CNDC's legal and tax
status without having to form their own 501(c)(3). Through a
rigorous vetting process, CNDC identifies charitable organizations
for fiscal sponsorship that are well positioned to benefit their
communities. These organizations receive our fiscal sponsorship and
become known as a 'Project' under the umbrella of CNDC's
501(c)(3). We take care of the management functions of finance,
human resources, legal compliance, and risk management, freeing
them to focus on their missions. They split the fee for these services
with other Projects, which lowers the cost substantially.

Why Fiscal Sponsorship

CNDC helps Projects make the best use of precious resources. Our
fiscal sponsorship increases their capacity to do more, faster – all
while demonstrating fiscal responsibility and accountability to their
stakeholders. With our expert counsel, sophisticated back office
infrastructure and organizational guidance, Projects are better
equipped to grow their programming and expand their reach in the
community. . . .

*https://cndc.org/what-we-do/*  According to City documents, Defendants specified that CNDC
was responsible for Human Resources services for the CRP, including benefit enrollment,
payroll functions, insurance and billing of payroll costs.

20.    CRP had no authority to determine the fiscal agent.

21.    Calderón was a member of the City committee that created the TJC program.

Calderón, as CRP's executive director, was charged with implementing and providing the

services in accordance with the TJC model from 2007 until December of 2017.

22.    The City renewed contracts with fiscal agents to run the CRP each year from 2007

to 2017.  The City put out a bid for the fiscal agent only once between 2007 and 2016, and that

was in 2011.  Otherwise, the City simply designated and renewed the contracts for the fiscal

agents of its choosing to provide administrative services for its CRP program.

23.    Huerter facilitated the City's renewal of contracts with fiscal agents for the CRP each year from 2007 to 2017.  Specifically, she drafted the RFP, developed the selection process and application criteria. She also determined when the City put out a bid for the fiscal agent, and who the fiscal agent should be.

24.    In 2017, the City decided to terminate its CRP program and put the transition from jail to community services out to bid by outside entities for the second time.  In July of 2017, Huerter, on behalf of the City, put out a formal RFP for the TJC program, six years since the last competitive process.  Calderón, unlike other potential bidders, was not given notice of the RFP by Huerter or other City officials, and only found out incidentally that the RFP was issued.

25.    Calderón, on behalf of CRP and its fiscal agent, was the only female contractor who responded to the RFP and applied for renewal of the contract CRP had held for the previous 10 years since the inception of the project that she co-founded.

26.    The process for evaluating applications for contracts such as the TJC contract was developed by defendant Huerter and is as follows: (i) the Crime Prevention and Control Commission ("Commission") reviews the applications and makes recommendations to the Executive Director of Denver Human Services ("DHS"); (ii) the Executive Director reviews and rubberstamps the recommendation to the Mayor; (iii) the Mayor selects the contractor and sends a proposed ordinance to the City Council; (iii) the City Council then votes to accept the proposed ordinance.  This was the process used in deciding on a contractor for the TJC contract.

27.     By ordinance, the Mayor, the Sheriff's Office, the Department of Public Health & Environment and the Department of Safety each have seats on the Crime Prevention and Control Commission, with the Department of Safety having two (2) seats.  Every head of a City agency sitting on the Commission was appointed by the Mayor.

28.     The practice has been that the City Council does not question the Mayor's choice and rubber-stamps his decision regarding contractors.

29.     The Mayor, who is presently defendant Hancock, is the "final decision-maker" in the contracting process, as he is for all executive decisions affecting the City.

30.     In the case of the July 2017 TJC contract request for proposal, Defendant Hancock selected an all-male leadership coalition composed of Servicios De La Raza, Urban League of Metro Denver, and Colorado Coalition for the Homeless to be awarded the contract.

31.     In awarding the contract to the coalition, Defendants terminated the CRP program.

*Speech*

32.     Ms. Calderón, as an individual and as co-chair of the Colorado Latino Forum, spoke out about matters of public concern involving the Mayor and other City officials, including but not limited to the following:

    a.      On June 15, 2017, as part of a press release from the Colorado Latino Forum and other groups, Ms. Calderón spoke out about: (i) discrimination against African Americans in the Sheriff Department, including the Sheriff's reorganization of

the Sheriff Department to exclude African Americans and Latinos from executive leadership; (ii) conditions at and management of the City's jail by the Sheriff Department, including but not limited to Sheriff Patrick Firman's ongoing leadership failures to adequately address jail overcrowding and rising assaults; and (iii) necessary changes in the management of jails, including diversifying DSD's executive leadership team to culturally reflect the staff and inmate population, increasing community engagement, addressing deputy fatigue to reduce excessive force incidents, reducing the jail population and rising assaults, creating more humane conditions for inmates by expanding mental health, medical, educational and reentry services, and enacting proportional discipline practices.

b.      In a meeting with the Mayor on August 14, 2017, Ms. Calderón again raised many of the same issues, including but not limited to the exclusion of African Americans from executive leadership in the Sheriff Department and the management of jails.

c.      Ms. Calderón, in her capacity as CLF co-chair, worked with criminal justice reform advocates and Sheriff union employees to draft an elected Sheriff ballot initiative that would have eliminated the Mayor's authority to appoint the Sheriff.

*Opposition to Discrimination*

33.      Ms. Calderón opposed not only the discrimination that was being visited upon her, but also discrimination against others, including but not limited to the following:

a.    On June 15, 2017, as part of a press release from the Colorado Latino Forum and other groups, Ms. Calderón spoke out about: (i) discrimination against African Americans in the Sheriff Department, including the Sheriff's reorganization of the Sheriff Department to exclude African Americans and Latinos from executive leadership; and (ii) necessary changes in the management of jails, including diversifying DSD's executive leadership team to culturally reflect the staff and inmate population.

b.    In a meeting with the Mayor on August 14, 2017, Ms. Calderón again raised many of the same issues, including but not limited to the exclusion of African Americans from executive leadership in the Sheriff Department and the management of jails.

34.    Ms. Calderón repeatedly warned City officials and City Council members that the applicants who were applying to receive the TJC contract were engaged in sexual harassment and the creation of a hostile work environment, for example:

a.    On October 19, 2017, Calderón complained to City officials that their recommendation that CRP staff collaborate with Servicios to transition the program to that organization would put CRP's all-female staff in harm's way by working with an organization that has a pattern and practice of creating a hostile work environment, particularly for women, among other concerns.

b.    On October 23, 2017, Calderón told defendant Hancock and another City official that the presumptive successful applicant, Servicios De La Raza and the Urban League of Metro Denver had a practice and reputation of creating a hostile and harassing

environment for women, an allegation supported by the subsequent resignation of the
Chief Executive Officer of the Urban League of Metro Denver; and by the fact that
Servicios De La Raza had engaged an independent firm to look into the conduct of other
executives.

*Retaliation*

35.    There were no issues with Calderón and CRP's performance under the Transition
from Jail to Community contract.

36.    On or about August 14, 2017, in a meeting attended by numerous people,
including the following Mayoral appointees: Mayor's Chief of Staff Alan Salazar, former Sheriff
Patrick Firman (Defendant here), former Sheriff's Chief of Staff Andrea Albo (Defendant here,
and Sheriff's Community Engagement Director Bennie Milliner, the Mayor, while pointing at
Ms. Calderón, stated that he was "personally offended" and "stung" by Ms. Calderón's criticisms
of his and Executive Director of Public Safety Stephanie O'Malley's treatment of African
American staff.  Mr. Salazar told Ms. Calderón that he objected to "the stench of words like
tokenism."

37.    Jess Vigil, Deputy Manager of Public Safety, who reported to Executive Director
O'Malley and the Mayor, told at least one other person that the City would take away Calderón
and CRP's contract because she spoke out about the Mayor, defendant Hancock, and the Sheriff,
defendant Firman.

38.    In or about June of 2017, officials in the Mayor's office, the City Attorney's
office, the Department of Safety, including defendant Jess Vigil, ~~and~~ the Sheriff Department,

including defendant Chief of Staff Andrea Albo and defendant Regina Huerter emailed each other about terminating Ms. Calderón and CRP's contract.

39.     There were numerous conversations between defendant Vigil and other City officials about terminating the CRP contract because of Calderón's activism and criticism of City officials, including defendants Hancock, Firman and Huerter; at one point Vigil telling another person that Calderón deserved to lose the contract and that Calderón had brought the termination of the CRP contract on herself.

40.     After the June 2017 press release, defendant Huerter, who oversaw the CRP contract, told Ms. Calderón that she needed to stop speaking out publicly about jail discrimination issues. Ms. Calderón told Ms. Huerter that she was infringing upon her First Amendment rights.

41.     Although City officials had automatically renewed the contract under which CRP worked since 2012 without an RFP, Denver Human Services, in collaboration with the Denver Sheriff Department headed by defendant Firman and the Department of Safety, whose Deputy Manager of Public Safety was defendant Vigil, issued an RFP for the contract in July of 2017.

42.     Defendants Vigil from the Department of Public Safety and Albo from the Sheriff's Office attempted to discredit Ms. Calderón by spreading the false and malicious rumor that Ms. Calderón had spoken out about the demotion of an African American Sheriff Division Chief because she was having an affair with him.

43.    Defendants City officials, including at least Hancock, Firman, ~~and~~ Vigil and

Huerter, set up a sham and pre-determined process for issuing and processing an RFP for the

Transition from Community to Jail Program, for example:

a.    Ms. Calderón and CRP were told by ~~former~~ defendant Huerter that they

would be involved in drafting any request for proposal, but they were intentionally

excluded from that process.

b.    Once the RFP was released on July 31, 2017, by Defendants in a general

announcement, defendant Huerter acknowledged that Ms. Calderón was not included in

the distribution list despite CRP holding the contract for 10 years. Calderón only learned

about the RFP later when a concerned city employee who was on the distribution list

notified her that CRP's project had been put out to bid.

c.    Defendant Huerter actively recruited organizations other than CRP to bid

on the RFP, including the Second Chance Center's Executive Director who declined out

of respect for Ms. Calderón work.

d.    Sheriff Department employees actively recruited organizations other than

CRP to bid on the RFP, even though they admitted that they should "stay clear of

anything around the RFP or any of the applicants…;" for example,

(i)    Sheriff Department Chief of Staff Andrea Albo wrote emails

attempting to solicit other bidders.

(ii)    On August 16, 2017-- two days after the meeting with defendant

Hancock and Firman in which Calderón complained about discrimination and

12

jail conditions, Denver Sheriff Department Programs Administrator Tien

Tong sent an email to undisclosed recipients stating "… Just want to make

sure you saw this and encourage you to apply! Application deadline is

9/11/2017."

(iii)        On multiple occasions in August of 2017 – starting on August 16 --

Sheriff Department Program Administrator Andrew Jones sent emails to

organizations other than CRP encouraging them to apply for the TJC grant.

e.        The bidder chosen by the Mayor, Colorado Coalition for the Homeless,

asked the Sheriff Department for a referral letter to attach to its application for the TJC

contract.

f.        In an acknowledgement of wrongdoing, defendant Firman has attempted

to hide the Sheriff Department's role in the RFP process, for example telling a crowd of

people on or about February 20, 2018, that the Sheriff Department had nothing to do with

the RFP process for the TJC contract.

g.        The initial committee considering applicants included close associates of

the Mayor, defendants or their delegates and board members of organizations applying

for the TJC contract, a fact investigated by the Denver Board of Ethics ("Ethics Board")

which recommended that the City consider changes in its protocol, policy and training to

address potential conflicts of interest in dealing with any future requests for proposals for

contracts;  the Board specifically recommended changes to avoid the "appearance of

impropriety potentially undermining the confidence and trust of the public and bidders in the fairness and integrity of the contracting process."

       h.     The President of the City Council, Albus Brooks, and defendant Huerter, repeatedly told relevant parties, including the CPCC and the City Council that CRP had failed in its performance of the TJC contract, a fact that was not true in any respect.

44.     As a result of the sham and pre-determined RFP process, on October 18, 2017, the Committee recommended that a coalition of organizations, which did not include CRP, be given the contract.  On or around October 23, 2017, DHS Director Mares approved the recommendation.  On or around November 6, 2017, defendant Hancock selected the coalition as the contractor for the TJC contract and on or around February 21, 2017, sent an ordinance awarding the contract to the coalition to the City Council.  The City Council approved the award of the contract to the coalition on March 19, 2018.

45.     During City Council meetings in which the contract was considered, various City Council members questioned the need for the RFCP and/or manner in which the contract was awarded, including the following:

       a.     In the City Council meeting in which the contract ordinance was approved, Councilwoman Debbie Ortega questioned the need to put the contract out for bid and noted the difference between the treatment of the TJC contract and another contract that the City has had in place since 2003 or so without an RFP, with other Council members also questioning the process and/or need for putting out the RFP for the TJC contract.

14

      b.      In a previous City Council committee hearing, Councilman Rafael Espinoza stated that the City's advancement of the contract did not "pass the smell test" and that if the City was going to retaliate against Ms. Calderón, "this was the way to do it."

46.     Defendants City and Hancock have a pattern and practice of retaliating against persons and organizations that have been critical of the City or its officials, for example, defendant Hancock terminated a deal that the City had reached with a developer because he did not like his social media posts critical of the Mayor's policy positions.

47.     Calderón and CRP attempted to bring conflicts of interest and retaliation to the attention of Huerter and other City officials, to no avail, for example:

      a.      On June 29, 2017, the Colorado Latino Forum issued a statement criticizing the Defendants' plan to retaliate against Ms. Calderón for her political speech about issues of jail management by planning to not renew her contract, including a superficial RFP process with a pre-determined outcome.

      b.      On or about August 14, 2017, Calderón complained to defendant Hancock and other City officials about the City's efforts to take the TJC contract from the CRP.

48.     After Ms. Calderón learned that her program was put out to bid because of her speech activities, she was deterred from speaking out against the mistreatment of others in the jail while she focused on saving her program, including the jobs of the five staff members that she supervised.

*Discrimination*

49.    Ms. Calderón was the only female contractor who applied for the Transition from Jail to Community RFP; all other contractors were led by males.

50.    Unlike male contractors, City officials did not provide Ms. Calderón with notice that the RFP had been issued; and did not encourage her to apply for the RFP, as the officials did for the male contractors, as described above.

51.    A male program staff administrator, Andrew Jones, who was actively involved in recruiting male contractors for the Transition from Jail to Community RFP had sexually demeaned Ms. Calderón in the past, for example, Jones once shouted at Calderón that, as a woman "he was sick of hearing her mouth."  Mr. Jones had previously made sexual advances to a staff member that Ms. Calderón supervised.

52.    Ms. Calderón repeatedly warned Huerter, other City officials and City Council members that the applicants who were recommended to receive the TJC contract were engaged in sexual harassment and the creation of a hostile work environment, for example:

a.    On October 19, 2017, Calderón complained to City officials that their recommendation that CRP staff collaborate with Servicios to transition the program to that organization would put CRP's all-female staff in harm's way by working with an organization that has a pattern and practice of creating a hostile work environment, particularly for women, among other concerns.

      b.      On October 23, 2017, Calderón told defendant Hancock and another City official that the presumptive successful applicant, Servicios De La Raza and the Urban League of Metro Denver had a practice and reputation of creating a hostile and harassing environment for women, an allegation supported by the subsequent resignation of the Chief Executive Officer of the Urban League of Metro Denver; and by the fact that Servicios De La Raza has engaged an independent firm to look into the conduct of other executives.

53.      Ms. Calderón's concerns were ignored by Defendants who awarded the contract to the male-led organizations.

54.      While Defendants were unconcerned about possible sexual misconduct on the part of male-led organizations applying for the TJC RFP, City officials, including defendants Vigil, and Albo sought to discredit Ms. Calderón by spreading the false and malicious rumor that Calderón had spoken out about the demotion of an African American Sheriff Division Chief because she was having an affair with him, thus undermining her credibility and competence.

_Damages_

55.      Ms. Calderón has suffered economic losses from the Defendants' actions, including but not limited to Defendants' refusal to renew the CRP's contract to provide transition from jail to community services, including but not limited to lost wages and benefits, and discrimination against her.

56.      Ms. Calderón has suffered damages to her reputation professionally and personally from the actions of Defendants, including but not limited to damage because

Defendants: (i) took away a contract for a public program that Calderón had led for a decade, (ii) falsely stated or caused to be stated that Ms. Calderón had failed in her public job as executive director of the CRP, (iii) attempted to discredit her by falsely accusing her of sexual misconduct, and (iv) discriminated against her in private and public actions.

57.    Ms. Calderón has suffered emotional and physical injuries and damages because of the actions of Defendants, including but not limited to damage because Defendants: (i) took away a public contract she had for a decade, (ii) falsely stated that Ms. Calderon had failed in her job as executive director of the CRP, (iii) attempted to discredit her by falsely accusing her of sexual misconduct, and (iv) discriminated against her in private and public actions.

58.    Ms. Calderón has suffered damages because of the deprivation by a government entity of her basic constitutional rights.

## VIOLATIONS ALLEGED

59.    As to each of the following claims for relief, paragraphs 1 through 58 above are incorporated by reference and re-alleged as if fully set forth in each separate claim.

## FIRST CLAIM

**(Violation of the First Amendment as Incorporated in the Fourteenth Amendment to the U.S. Constitution)**

60.    Defendants are a municipality and city officials and at all times relevant to this complaint were acting under color of state law.

61.    In taking the actions described above, especially the actions of refusing to award to Ms. Calderón or failing to renew the TJC contract administered by Ms. Calderón in retaliation

for Ms. Calderón exercising her rights under the First Amendment to the U.S. Constitution, and

by placing unconstitutional conditions upon Calderón's receipt of benefits, *i.e.* a City contract,

Defendants, acting individually and together, violated Calderón's rights under the First

Amendment to the United States Constitution, as incorporated by the 14th Amendment.

62.    Defendants took these actions knowing that they were unlawful or in reckless

disregard of their unlawfulness.

63.    Defendants' actions caused harm to Calderón, which harm Calderón seeks to

remedy through action authorized under 42 U.S.C. §1983.

## SECOND CLAIM

### (Violation of the Fourteenth Amendment to the U.S. Constitution)

64.    Defendants are a municipality and city officials and at all times relevant to this

complaint were acting under color of state law.

65.    In taking the actions described above, especially the actions of treating Ms.

Calderón differently without reason with respect to the RFP process and awarding the TJC

contract to male-led organizations with known histories of sexual harassment and the creation of

hostile work environments for women, and retaliating against her for opposing discrimination

against her and others, Defendants, acting individually and together, violated Calderón's rights

under the equal protection and due process clauses of the Fourteenth Amendment to the United

States Constitution.

66.    Defendants took these actions knowing that they were unlawful or in reckless

disregard of their unlawfulness.

67.     Defendants' actions caused harm to Calderón, which harm Calderón seeks to remedy through action authorized under 42 U.S.C. §1983.

### THIRD CLAIM
### (Conspiracy to Violate Constitutional Rights)

68.     Defendants are a municipality and city officials and at all times relevant to this complaint were acting under color of state law.

69.     In taking the actions described above, especially the actions of acting in concert for the purpose of depriving Ms. Calderon of the government contract that she had held for almost a decade and discriminating against her on the basis of her gender, Defendants violated Calderón's rights under the First Amendment and the equal protection and due process clauses of the Fourteenth Amendment to the United States Constitution.

70.     Defendants took these actions knowing that they were unlawful or in reckless disregard of their unlawfulness.

71.     Defendants' actions caused harm to Calderón, which harm Calderón seeks to remedy through action authorized under 42 U.S.C. §1983.

### PRAYER FOR RELIEF

A.     In view of all of the preceding, Ms. Calderón respectfully requests that this Court award, adjudge and decree that:

(1)     The conduct alleged is violative of federal law and of Calderón's rights thereunder.

(2)     In accordance with federal law,

(a)    Defendants pay to Calderón an amount – the exact total of which is presently undetermined – comprised of

(I)    The damages she has sustained and damages she will sustain in the future as a result of Defendants' violations, economic, emotional, constitutional and reputational, and

(II)    Exemplary or punitive damages, as allowed under law.

(b)    Ms. Calderón be awarded her costs of suit, including reasonable attorneys' fees and costs.

(c)    Ms. Calderón be awarded interest on the above; and

B.    Ms. Calderón have such other, further and different relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury.

**Dated** this 16th day of June 2021.

Respectfully submitted:

*/s Patricia S. Bangert*

_____

Patricia S. Bangert, Attorney at Law, LLC
501 S. Cherry Street, Suite 1100
Denver, Colorado 80246
Phone: (303) 228-2175
        (303) 947-5155 (cell)
Fax: (720) 728-1253
Email: trish@pbangertlaw.com
*Attorney for Plaintiff*

Address of Plaintiff:

c/o Patricia S. Bangert, Attorney at Law, LLC