IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 18-cv-00756-PAB-MEH

LISA CALDERÓN,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER,
MICHAEL HANCOCK,
PATRICK FIRMAN,
JESS VIGIL,
ANDREA ALBO, and
REGINA HUERTER,

      Defendants.

---

### ORDER

---

This matter is before the Court on defendants' Motion to Dismiss Amended Complaint. Docket No. 65. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1391(b).

## I.  BACKGROUND

### A.  <u>Factual Background</u>[1]

This case arises out of the non-renewal of a city contract for the Community Reentry Project ("CRP") program. Docket No. 62 at 3, 14-15, ¶¶ 11, 44, 46. The City and County of Denver (the "City") created the CRP program in 2007 to provide "transitional services to adult Denver residents released from the Denver County Jail and Downtown

---

[1] The facts below are taken from plaintiff's amended complaint, Docket No. 62, and are presumed to be true for purposes of ruling on defendants' motion to dismiss.

Detention Center." *Id.* at 4, ¶ 14. From its inception until December 2017, the CRP provided services, including Transition from Jail to Community services ("TJC")[2], which are transitional services for adult Denver residents released from the Denver County Jail and Downtown Detention Center. *Id.*, ¶ 15. CRP was not incorporated and did not have its own legal status. *Id.*, ¶ 16.

Plaintiff Lisa Calderón, a Latina/African-American woman, served on the City committee that created the TJC program. *Id.* at 3, 5, ¶¶ 12, 21. Between 2007 and December 2017, Dr. Calderón was the Executive Director of CRP, and she was charged with implementing and providing transitional services under the TJC model. *Id.* at 5, ¶ 21.

Because the City could not directly run a "non-profit community-based group," the City designated an entity to act as a fiscal agent for the CRP and to provide Human Resources services, including benefit enrollment, payroll functions, insurance and billing of payroll costs. *Id.* at 4-5, ¶¶ 18-19. The CRP had no authority to determine the fiscal

---

[2] Throughout the amended complaint, motion to dismiss, and plaintiff's response, the parties use the terms TJC program, TJC model, TJC contract, and TJC services, sometimes interchangeably, without defining or differentiating between them. *Compare* Docket No. 62 at 6, ¶ 24, ("Huerter, on behalf of the City, put out a formal RFP for the TJC program") *with id.* at 7, ¶ 30, ("In the case of the July 2017 TJC contract request for proposal"). The amended complaint defines TJC as "Transition from Jail to Community," *id.* at 4, ¶ 15, while plaintiff's response defines TJC as "services to inmates transitioning from jail to the community in an effort to reduce recidivism (called the transition from jail to community program or 'TJC')". Docket No. 78 at 6. Based on the parties' use of the terms, the Court presumes that "TJC Services" are "services including transitional services to adult Denver residents released from the Denver County Jail and Downtown Detention Center," Docket No. 62 at 4, ¶ 14, that are based on the "(TJC) model developed by the National Institute of Corrections and Urban Institute," *id.*, ¶ 15, that the "TJC Program" is a program designed to implement TJC services, and that the "TJC Contract" is a contract the City offered to contractors to run a TJC program in Denver. *Id.* at 5-6, ¶¶ 21, 24.

agent.  *Id.* at 5, ¶ 20.  From 2007 to 2017, the City renewed contracts with three different fiscal agents to run the CRP.  *Id.* at 4-5, ¶¶ 18, 22.  Once, in 2011, the City put out a bid for the fiscal agent that would run the CRP.  *Id.* at 5, ¶ 22.  Ms. Huerter was the Executive Director of the Office of Behavioral Health Strategies in the Denver Department of Public Health & Environment and managed the Crime Prevention and Control Commission for the City of Denver.  *Id.* at 2, ¶ 7.  Ms. Huerter facilitated the renewal of contracts with fiscal agents for the CRP each year from 2007 to 2017.  *Id.* at 6, ¶ 23.  She determined when the City put out a bid for the fiscal agent, the selection process and application criteria for the fiscal agents, and who the fiscal agent should be. *Id.*

In June 2017, Dr. Calderón spoke out about discrimination against African Americans and Latinos in the Denver Sheriff's Department in a press release issued by the Colorado Latino Forum.  *Id.* at 7-8, ¶ 32.  After the June 2017 press release, Ms. Huerter told Dr. Calderón that she needed to stop speaking out on jail discrimination issues, and Dr. Calderón responded that Ms. Huerter was infringing on her First Amendment rights.  *Id.* at 11, ¶ 40.

In June 2017, officials in various City offices, including the Mayor's Office, the City Attorney's Office, the Department of Safety, and the Sheriff Department, discussed terminating Dr. Calderón and CRP's contract.  *Id.* at 10-11, ¶ 38.  Defendant Jess Vigil, who was serving as the Deputy Manager of Public Safety for the City of Denver, spoke to other officials about "terminating the CRP contract because of Calderón's activism and criticism of City officials."  *Id.* at 2, 11, ¶¶ 5, 39.

In a meeting on August 14, 2017, Dr. Calderón raised many of the same issues in a meeting with Michael Hancock, the Mayor of Denver, and she worked with criminal justice reform advocates on a ballot initiative that would have eliminated the Mayor's authority to appoint the Sherriff.  *Id.* at 8, ¶ 32.  During the meeting on August 14, 2017, Mayor Hancock stated that he was "'personally offended' and 'stung' by Ms. Calderon's criticisms of his and Executive Director of Public Safety Stephanie O'Malley's treatment of African American staff."  *Id.* at 10, ¶ 36.

In July 2017, the City decided to terminate its CRP program, and Ms. Huerter, on behalf of the City, issued a formal request for proposals ("RFP") for outside bidders to provide jail to community services (the "TJC Contract") for the City.  *Id.* at 6, ¶ 24.  Dr. Calderón was not included on the distribution list for the RFP, *id.* at 12, ¶ 43(b), and Ms. Huerter and employees of the Sheriff's Department actively recruited organizations other than CRP to participate in the bidding process.  *Id.*, ¶ 43(c), (d).  Albus Brooks, President of the Denver City Council, and Ms. Huerter told the Crime Prevention and Control Commission and the Denver City Council that "CRP had failed in its performance of the TJC contract."  *Id.* at 14, ¶ 43(h).  After learning about the RFP from a concerned City employee, Dr. Calderón, on behalf of CRP and its fiscal agent, responded to the RFP and applied for renewal of the contract.  *Id.* at 6, 12, ¶¶ 24-25, 43(b).  Dr. Calderón was the only woman to respond to the RFP; all of the other contractors were led by men.  *Id.* at 6, ¶ 25.

Ms. Huerter developed the process for reviewing applications for a City contract such as the TJC contract, which involved four steps.  *Id.*, ¶ 26.  First, the "Crime Prevention and Control Commission . . . reviews the applications and makes

recommendations to the Executive Director of Denver Human Services." *Id.* Second, "the Executive Director reviews and rubberstamps the recommendation to the Mayor." *Id.* Third, "the Mayor selects the contractor and sends a proposed ordinance to the City Council." *Id.* Finally, the City Council "votes to accept the proposed ordinance." *Id.* The Mayor is the final decision maker in the contracting process. *Id.* at 7, ¶ 29.

The Mayor, Sheriff's Office, Department of Public Health & Environment, and the Department of Safety each have a seat on the Crime Prevention and Control Commission, and the Department of Safety has one additional seat. *Id.*, ¶ 27. On October 18, 2017, the review committee recommended that a coalition of organizations, including Servicios De La Raza, Urban League of Metro Denver, and Colorado Coalition for the Homeless, *id.*, ¶ 30, be awarded the TJC contract. *Id.* at 14, ¶ 44. City Council members Debbie Ortega and Rafael Espinoza expressed concerns about the RFP process at the meeting where the TJC contract was considered. *Id.* at 14-15, ¶ 45. For example, Ms. Ortega questioned whether the TJC contract needed to be put out for bid at all and noted that the contract had been treated differently from another City contract that had been in place since 2003. *Id.* Mr. Espinoza stated that the City's "advancement of the contract did not 'pass the smell test'" and indicated that putting the contract up for bid would be a good way to retaliate against Dr. Calderón. *Id.*

Following approval of the committee's recommendation by Denver Human Services Director Don Mares and Mayor Hancock, the TJC Contract was formally awarded to the recommended coalition of organizations on March 19, 2018. *Id.* at 14, ¶ 44. By awarding the TJC Contract to new entities, the City terminated the CRP program. *Id.* at 7, ¶ 31.

B. **Procedural Background**

Dr. Calderón initiated this lawsuit on April 2, 2018, alleging claims under 42 U.S.C. § 1983 for First Amendment retaliation and violation of her equal protection and due process rights under the Fourteenth Amendment.  Docket No. 1 at 13-15.  On June 18, 2018, defendants moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  Docket No. 21.  On September 17, 2019, the Court granted defendants' motion to dismiss, ruling Ms. Calderon lacked prudential standing.  Docket No. 32 at 19-20.  On March 30, 2021, the Tenth Circuit reversed the Court's order on defendants' motion to dismiss.  Docket No. 46.  The Tenth Circuit ruled Dr. Calderón successfully alleged "a direct relationship between her damages flowing from the loss of the contract to administer the TJC[]" and that Dr. Calderón did not need to rely on prudential standing from CRP or its fiscal agent.  *Id.* at 21.  The Tenth Circuit issued its mandate on April 21, 2021 and the case was remanded for further proceedings.  Docket No. 47.

In a status conference in front of Magistrate Judge Michael Hegarty on June 2, 2021, Dr. Calderón requested leave to file an amended complaint.  Docket No. 56.  Magistrate Judge Hegarty granted Dr. Calderón leave to file an amended complaint.  *Id.*  Dr. Calderón filed an amended complaint, adding Ms. Huerter and a claim for conspiracy pursuant to § 1983.  Docket No. 57; Docket No. 62.  Dr. Calderón asserts that she and CRP have "suffered economic losses from the [d]efendants' . . . refusal to renew the CRP's contract . . ., including but not limited to lost wages and benefits and lost reputation, and discrimination against her."  Docket No. 62 at 17, ¶ 55.  She seeks actual and punitive damages and an award of reasonable attorney's fees and costs.  *Id.*

6

at 20-21.  Defendants filed a motion to dismiss Dr. Calderón's amended complaint.

Docket No. 65.  Dr. Calderón filed a response to the motion, Docket No. 78, to which

defendants replied.  Docket No. 79.

## II.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, a complaint must allege enough factual matter that, taken as true, makes

the plaintiff's "claim to relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671

F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  "The 'plausibility' standard requires that relief must plausibly follow from the

facts alleged, not that the facts themselves be plausible."  *RE/MAX, LLC v. Quicken*

*Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534

F.3d 1282, 1286 (10th Cir. 2008)).  Generally, "[s]pecific facts are not necessary; the

statement need only 'give the defendant fair notice of what the claim is and the grounds

upon which it rests.'"  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting

*Twombly*, 550 U.S. at 555) (alterations omitted).  However, a plaintiff still must provide

"supporting factual averments" with her allegations.  *Cory v. Allstate Ins.*, 583 F.3d

1240, 1244 (10th Cir. 2009) ("conclusory allegations without supporting factual

averments are insufficient to state a claim on which relief can be based" (citation

omitted)).  Otherwise, a court need not accept conclusory allegations.  *Moffet v.*

*Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).  "[W]here the

well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged – but it has not shown – that the pleader is

entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations

omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286 (alterations omitted).

## III. ANALYSIS

Defendants move to dismiss Dr. Calderón's claims pursuant to Rule 12(b)(6). Docket No. 65.  Defendants argue that Dr. Calderón's First Amendment claim fails because defendants have qualified immunity and because Dr. Calderón has failed to state a claim for municipal liability.  *Id.* at 7-13.  Moreover, defendants assert that Dr. Calderón's amended complaint alleges insufficient facts to support her Fourteenth Amendment claim and conspiracy claim.  *Id.* at 12-15.  Defendants also move to dismiss plaintiff's claims against Ms. Huerter as untimely pursuant to Fed. R. Civ. P. 15. *Id.* at 5-6.

### A.  <u>Rule 15</u>

Judge Hegarty granted Dr. Calderón leave to file an amended complaint, observing that defendants did not oppose the amendment.  Docket No. 56.  Dr. Calderón filed an amended complaint by the deadline naming Ms. Huerter as a

defendant and stating her § 1983 conspiracy claim as a separate claim.  Docket No. 62 at 1, 20; Docket No. 57-2 at 1, 21-22.

Defendants assert that Dr. Calderón's adding of Ms. Huerter as a defendant is untimely under Fed. R. Civ. P. 15, addressing the amendment as though defendants are opposing a motion to amend instead of objecting to Judge Hegarty's order allowing Dr. Calderón to amend her complaint.  *See* Docket No. 65 at 5-6.  Defendants state that, "[a]t the June 30, 2021 conference," after Judge Hegarty allowed Dr. Calderón to amend her complaint, "undersigned counsel indicated that he would include his FRCP 15 objection to the amended complaint with the motion to dismiss for efficiency purposes."  *Id.* at 1 n.1.  To the extent this portion of defendants' motion can be construed as an objection to Judge Hegarty's ruling that Dr. Calderón may file an amended complaint, the Court will overrule defendants' objections.  When reviewing a party's objection to a magistrate judge's order on a non-dispositive matter, the court "must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law."  Fed. R. Civ. P. 72(a).  Defendants fail to suggest Judge Hegarty's ruling was erroneous in any way, especially in light of their failure to object.

Addressing defendants' arguments as an opposition to an amended complaint, instead of as an objection, does not yield a different result.  Rule 15(a) provides that courts should "freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Rule 15 instructs that courts should grant amendments to the pleadings in the absence of undue delay, prejudice, futility, failure to cure deficiencies by amendments

previously allowed, or bad faith. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993).

Defendants assert that Dr. Calderón's adding of Ms. Huerter as a defendant is untimely under Fed. R. Civ. P. 15 because Dr. Calderón knew about Ms. Huerter's involvement in the events surrounding Dr. Calderón's claims at the time she filed her original complaint. Docket No. 65 at 5-6. Dr. Calderón responds that adding Ms. Huerter is timely because discovery has not started. Docket No. 78 at 2. Defendants admit that Dr. Calderón's delay in adding Ms. Huerter was not the result of dilatory conduct, but rather was a result of the appeal process in this case. Docket No. 65 at 5-6. Additionally, Magistrate Judge Hegarty granted Dr. Calderón leave to file an amended complaint noting that defendants did not object. *See* Docket No. 56. Defendants do not argue Magistrate Judge Hegarty's ruling was in error. *See* Docket No. 65 at 5-6. Because Dr. Calderón filed the amended complaint by the deadline Magistrate Judge Hegarty set, the Court finds that her addition of Ms. Huerter was timely.

Defendants also assert that Dr. Calderón's amendment is prejudicial to Ms. Huerter because she will be forced to participate in a case involving factual matters from four years ago. Docket No. 65 at 6. "Courts typically find prejudice only when the amendment unfairly affects the defendants in terms of preparing their defense to the amendment. Most often, this occurs when the amended claims arise out of a subject matter different from what was set forth in the complaint and raise significant new factual issues." *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1208 (10th Cir. 2006) (internal quotations and citations omitted). Here, defendants assert that is unclear that

adding Ms. Huerter changes Dr. Calderón's claim.  Docket No. 65 at 6.  They do not assert that her addition changes the litigation to an extent that would be prejudicial to Ms. Huerter.  *See id.*  Accordingly, prejudice has not been established, and the Court will reject defendants' argument.

### B.  First Amendment Claim

Defendants move to dismiss Dr. Calderón's claim for violation of her First Amendment rights based on each individual defendant's invocation of qualified immunity.  *Id.* at 6-11.

#### 1.  *Qualified Immunity*

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  When a defendant raises the defense of qualified immunity, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct."  *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (internal quotation marks omitted).  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis

11

should be addressed first in light of the circumstances in the particular case." *Pearson*, 555 U.S. at 236.  Thus, to survive a motion to dismiss under Rule 12(b)(6) "where a qualified immunity defense is implicated, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights.'"  *Hale v. Duvall*, 268 F. Supp. 3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins v. Oklahoma ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1249 (10th Cir. 2008)). However, a plaintiff facing a qualified immunity challenge does not have a heightened pleading standard.  *Currier v. Doran*, 242 F.3d 905, 916-17 (10th Cir. 2001).

Defendants invoke qualified immunity on behalf of each individual defendant. Defendants argue that Dr. Calderón fails to meet the first prong of qualified immunity because she does not show that each individual defendant is responsible for any constitutional violations Dr. Calderón alleges and that Dr. Calderón fails to meet the second prong of qualified immunity because she has not identified a clearly established right that defendants violated.  Docket No. 65 at 7-11.  Based on defendants' invocation, Dr. Calderón has the burden of meeting both prongs of the qualified immunity test by establishing a clearly established right that was violated and by sufficiently alleging that each defendant was responsible for the violation.  *See Pahls v. Thomas*, 718 F.3d 1210, 1229 (10th Cir. 2013).

### a.  Clearly Established Right

Defendants argue that Dr. Calderón cannot satisfy the second prong of a qualified immunity analysis because she fails to identify a clearly established right that defendants violated.  Docket No. 65 at 11.  Specifically, defendants claim that "Plaintiff

cannot clearly establish that she, as Executive Director[3] of a City Program that performs services under a third-party contract, has a First Amendment right for Denver not to put that contract out for an RFP."  *Id.*

In order to identify clearly established law, Dr. Calderón need not cite a case directly on point, and instead must show "the law 'would have been clear to a reasonable [government employee in defendant's position] that his conduct was unlawful in the situation.'"  *Knopf v. Williams*, 884 F.3d 939, 949 (10th Cir. 2018) (quoting *Klen v. City of Loveland*, 661 F.3d 498, 511 (10th Cir. 2011)).  In *Knopf*, a First Amendment retaliation case involving a government employee, the court considered whether plaintiff's speech was the type of speech protected by the First Amendment under clearly established law.  *Id.* at 945.  The court stated the that "key question" in determining if plaintiff met his burden of identifying clearly established law was whether defendant could have reasonably believed at the time he fired plaintiff that a government employer could fire an employee based on the speech plaintiff engaged in. *Id.* at 949.  Because the plaintiff in *Knopf* could not show that defendant's belief would be unreasonable under established law, *Knopf* observed that defendant was entitled to qualified immunity.  *Id.*

In response to defendants' argument that no clearly established law covers Dr. Calderón claim, she states that the unconstitutional conditions doctrine applies to her

---

[3]  Defendants argue that, to the extent Dr. Calderón argues she is a City employee, defendants dispute whether Dr. Calderón engaged in protected speech. Docket No. 65 at 9-10 n.9.  Defendants, however, acknowledge that the determination of whether speech is protected "may be more appropriate at the summary judgment stage."  *Id*.  Because defendants do not argue plaintiff has not plausibly alleged that she engaged in protected speech, the Court declines to address this "threshold question." *See id.*

retaliation claim.  Docket No. 78 at 4.  Dr. Calderón states that "the First Amendment protects independent contractors from the termination of at-will government contracts in retaliation for their exercise of the freedom of speech."  *Id.* at 5 (quoting *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 670 (1996)).  She also argues that the Tenth Circuit has identified contracts as a benefit specifically covered by the unconstitutional conditions doctrine.  *Id.* (citing *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1258 (10th Cir. 2016)).  Dr. Calderón claims that her allegations fit under the unconstitutional conditions doctrine because "she had a government benefit, in the form of a contract she had held for many years, and that benefit was taken from her because she spoke out about matters of public concern."  *Id.* at 3-4.  Additionally, Dr. Calderón maintains that her First Amendment claim involves her loss of a benefit, namely the CRP contract, as opposed to defendants' decision to put out the TJC contract for bids.  *Id.*

The amended complaint alleges that Dr. Calderón was individually "charged with implementing and providing [] services in accordance with the TJC model" as executive director of CRP, Docket No. 62 at 5, ¶ 21; Dr. Calderón applied for the TJC contract "for renewal of the contract CRP had held for the previous 10 years" on behalf of CRP and its fiscal agent, *id.* at 6, ¶¶ 24-25; defendants wanted to terminate CRP's contract because Dr. Calderón "deserved to lose the contract" based on her protected speech, *id.* at 11, ¶ 39; one defendant said "the City would take away [Dr.] Calderón and CRP's contract" because Dr. Calderón spoke out about Mayor Hancock, *id.* at 10, ¶ 37; and that the defendants instituted the RFP process for the TJC contract as a sham pre-

determined procedure to result in the termination of the CRP contract.  *Id.* at 12-14, ¶¶ 43-44.

The Tenth Circuit has identified "an overarching principle, known as the unconstitutional conditions doctrine, that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up."  *Planned Parenthood Ass'n of Utah*, 828 F.3d at 1258 (quoting *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013)).  "[T]he unconstitutional-conditions doctrine has been applied when the condition acts retrospectively in a *discretionary* executive action that terminates a government-provided benefit—typically public employment, a government contract, or eligibility for either—in retaliation for prior protected speech or association."  *Id.* (quoting *Planned Parenthood of Kan. v. Moser*, 747 F.3d 814, 839 (10th Cir. 2014)).  Under this doctrine, the Supreme Court has ruled that "the First Amendment protects independent contractors from the termination of at-will government contracts in retaliation for their exercise of the freedom of speech."  *Umbehr*, 518 U.S. at 670.  In order to prove a claim for retaliation, a contractor "must show that the termination of his contract was motivated by his speech on a matter of public concern."  *Id.* at 685.

First, to the extent defendants argue that Dr. Calderón's claim is not a violation of clearly established law because the TJC contract was put out for an RFP, as opposed to being terminated, Docket No. 65 at 11, the Court finds this argument lacks support.  In *Umbehr*, the Court stated that its holding did not apply to "bidders or applicants for new government contracts," but rather applied only to "the termination or nonrenewal of a pre-existing commercial relationship with the government."  518 U.S. at 670.  As Dr.

Calderón points out, Docket No. 78 at 3-4, her claim is about "failing to renew the TJC contract administered by [Dr.] Calderón, in retaliation for [Dr.] Calderón exercising her rights under the First Amendment," Docket No. 62 at 18-19, ¶ 61, not about the decision to accept new bids for the TJC contract generally.

In their reply, defendants expand on their argument that Dr. Calderón has not identified a clearly established right, arguing that Dr. Calderón fails to identify any case law, including *Umbehr*, particularized to the facts of her claim.[4]  Docket No. 79 at 3-4. Defendants state the fact "[t]hat Plaintiff may have experienced a benefit from the granting of the contract to CRP[] does not mean that she was either a government contractor or a government employee for First Amendment purposes."  *Id.*  Here, because defendants challenge whether plaintiff, as a person who is not directly named in a government contract, is the type of person protected by the unconstitutional conditions doctrine explained in *Umbehr*, the relevant questions is whether, at the time of the termination of CRP's contract, reasonable employees in defendants' positions

---

[4] Defendants state "the *Umbehr* Court noted the important distinction between those personally holding government contracts and 'persons with less close relationships with the government'" to argue that the right in *Umbehr* is limited to the parties to a government contract and not persons performing work under a government contract.  *Id.* at 4 (quoting *Umbehr*, 518 U.S. at 680).  The context of the quote defendants pull from *Umbehr* reveals a different proposition than defendants' articulation.  *Umbehr* observed that the argument that protecting government contractors' First Amendment rights improperly extended protections that should only be afforded to government employees was not persuasive, because the "First Amendment permits neither the firing of janitors nor the discriminatory pricing of state lottery tickets based on the government's disagreement with certain political expression.  Independent contractors appear to us to lie somewhere between the case of government employees, who have the closest relationship with the government, and our other unconstitutional conditions precedents, which involve persons with less close relationships with the government."  *Umbehr*, 518 U.S. at 680-81.

would believe the government could terminate CRP's contract because of Dr. Calderón's speech.  *See Knopf*, 884 F.3d at 949.

In *Umbehr*, the plaintiff, an individual as to a company, had previously been under contract with Wabaunsee County to work as the exclusive hauler of trash for cities within the county.  518 U.S. at 671.  Plaintiff spoke critically of defendant, the Board of County Commissioners of Wabaunsee County, at board meetings and in newspaper editorials.  *Id.*  After plaintiff's public criticism, defendant terminated or prevented the automatic renewal of plaintiff's contract with Wabaunsee County.  *Id.*  Plaintiff alleged that defendant terminated his contract in retaliation for his criticism of defendant.  *Id.* at 672.  The Court "recognize[d] the right of independent government contractors not to be terminated for exercising their First Amendment rights" and remanded the case to make further findings of fact.  *Id.* at 686.

While the plaintiff in *Umbehr* appears to have been a party to a contract with the county, that status appears to be less important to the outcome of the case than the fact that the plaintiff was so clearly associated with the contract that, in retaliation for plaintiff's public criticisms of the board of county commissioners, the county terminated plaintiff's contract.  This interpretation of *Umbehr* is supported by *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712 (1996), the companion case to *Umbehr*.  *O'Hare* ruled that the unconstitutional conditions doctrine applies "where government retaliates against a contractor, or a regular provider of services," on the basis of political affiliation.[5]  *Id.* at 715.  In *O'Hare*, the plaintiff, John Gratzianna, owned a company,

---

[5] *O'Hare* acknowledged that the test for what constitutes retaliation based on the right of free speech and political affiliation are "different, though related, inquir[ies]," but characterized the right in *Umbehr*, a free speech case, as applying to "service

O'Hare Truck Service, that provided towing services.  *Id.*  Defendant, the City of

Northlake, coordinated towing services through its police department and maintained a

rotating list of available towing companies.  *Id.*  When the police department received a

tow request, it would call the towing company next on the rotating list.  *Id.*  When

Gratzianna refused the mayor's request for support in his reelection campaign,

Gratzianna's truck service was removed from the rotating list of towing services.  *Id.*

Getting on the list of tow companies does not appear to have been a matter of contract.

Moreover, the towing was done by O'Hare Truck Service, not by Gratzianna, its owner.

Nevertheless, the city retaliated against Gratzianna by taking O'Hare Truck Service off

the rotating list when Gratzianna refused to provide a political contribution.  Thus,

*O'Hare* focused on Gratzianna's First Amendment rights, not on whether Gratzianna

had a contract with the city.  *O'Hare* observed that "[g]overnment officials may indeed

terminate at-will relationships, unmodified by any legal constraints, without cause; it

does not follow that this discretion can be exercised to impose conditions on

expressing, or not expressing, specific political views."  *Id.* at 725-26.

Dr. Calderón alleges that the government terminated the CRP contract because

of her protected speech.  Docket No. 62 at 10-12, ¶¶ 37-39, 43.  Based on the

allegations that defendants terminated the CRP contract to punish Dr. Calderón, a

reasonable person in the defendants' positions would not think it was permissible to

terminate CRP's contract based on Dr. Calderón's public speech simply because Dr.

Calderón was not a party to CRP's contract.  Dr. Calderón has sufficiently alleged a

---

provider[]s" and relied on *Umbehr* to extend political affiliation protections to contractors.
518 U.S. at 719, 721.

violation of her First Amendment rights based on the unconstitutional conditions doctrine as expressed by *Umbehr*.  The Court will decline to grant defendants' motion based on the second prong of the qualified immunity analysis.

### b. Personal Involvement

Defendants argue that Dr. Calderón's First Amendment claim cannot survive the first prong of a qualified immunity analysis because she has not pled sufficient facts to support the personal involvement of any defendant.[6]  Docket No. 65 at 7-8.  Dr. Calderón responds that she sufficiently alleges supervisory liability regarding Mayor Hancock and Ms. Huerter and alleges specific allegations of personal participation for the other defendants.  Docket No. 78 at 7-11.

Arguments that an individual defendant was not personally involved in the violation of a plaintiff's rights are properly considered under the first prong of a qualified immunity analysis.  *See Buck v. City of Albuquerque*, 549 F.3d 1269, 1279 (10th Cir. 2008).  "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation."  *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997).  "Personal involvement is not limited solely to situations where a defendant violates a plaintiff's rights by physically placing hands on him."  *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008).  Therefore, "[f]or liability under section 1983, direct participation is not necessary."  *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990).

---

[6]  Defendants argue that Ms. Calderón makes conclusory arguments that impermissibly "plead the possibility of wrongdoing in the cumulative."  Docket No. 65 at 10.  Defendants do not explain why Ms. Calderón's allegations are conclusory.  At the motion to dismiss stage, "occasional use of collective references to 'the Defendants' . . . does not automatically defeat [plaintiff's] claims."  *Bledsoe v. Carreno*, 53 F.4th 589, 609 (10th Cir. 2022).

"Any official who 'causes' a citizen to be deprived of her constitutional rights can also be held liable.  The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights."  *Id.*  "Concerning a defendant acting in a non-supervisory capacity, there must be cause in fact between the conduct complained of and the constitutional deprivation."  *Id.* (citing *Wulf v. City of Wichita*, 883 F.2d 842, 864 (10th Cir. 1989)).  Regarding supervisor liability, "§ 1983 does not recognize a concept of strict supervisor liability; the defendant's role must be more than one of abstract authority over individuals who actually committed a constitutional violation."  *Fogarty*, 523 F.3d at 1162 (citing *Jenkins v. Wood*, 81 F.3d 988, 994–95 (10th Cir. 1996)).  "Yet in situations where an 'affirmative link' exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise, the supervisor may be personally liable."  *Id.* (quoting *Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993)) (some quotation marks omitted).

### i. Michael Hancock

Dr. Calderón alleges that Michael Hancock was the Mayor of the City of Denver at all times relevant to her amended complaint, Docket No. 62 at 1, ¶ 3; Mayor Hancock participated in conversations about terminating the CRP contract because of Dr. Calderón's activism and criticisms, *id.* at 11, ¶ 39; Mayor Hancock set up a "sham" procedure to collect new bids, *id.* at 12, ¶ 43; Mayor Hancock was the "final decision-maker" in the contracting process, *id.* at 7, ¶ 29; and Mayor Hancock recommended a new contractor be given Dr. Calderón's former role via an ordinance that was approved

by the City Council.  *Id.* at 14, ¶ 44.  Dr. Calderón alleges that these actions were taken in retaliation for Dr. Calderón's speech and led to CRP losing the contract with the City and Dr. Calderón losing the ability to work under the CRP contract.  *Id.* at 18-19, ¶ 61. The Court finds Dr. Calderón has sufficiently alleged that Mayor Hancock personally participated in the termination of Dr. Calderón's contract in his role as the final decision maker.

### ii. Regina Huerter

Dr. Calderón alleges that Ms. Huerter was Dr. Calderón's functional "supervisor," *id.* at 4, ¶ 17; told Dr. Calderón to stop speaking out publicly about jail discrimination issues, *id.* at 11, ¶ 40; created a sham process to take away the TJC contract from CRP and Dr. Calderón, *id.* at 12, ¶ 43; put out the RFP, *id.* at 6, ¶ 24; developed the procedure to evaluate applications for the TJC contract, *id.*, ¶ 23; did not inform Dr. Calderón of the RFP, *id.*, ¶ 24; falsely told relevant parties that CRP failed in its performance of the TJC contract, *id.* at 14, ¶ 43(h); and actively recruited organizations other than CRP for the TJC contract.  *Id.* at 12, ¶ 43(b).  The Court finds Dr. Calderón has sufficiently alleged Ms. Huerter's personal participation.

### iii. Patrick Firman

Dr. Calderón alleges that defendant Firman was "the Sheriff of the City and County of Denver, and as such, []the head of the Denver Sheriff Department."  *Id.* at 2, ¶ 4.  Dr. Calderón alleges that the Sheriff's Office has a seat on the Crime Prevention and Control Commission and that the Commission recommended a new contractor to replace Dr. Calderón.  *Id.* at 6-7, ¶¶ 26-27.  Dr. Calderón alleges that Sheriff Firman tried to hide the Sheriff Department's role in the RFP process.  *Id.* at 13, ¶ 43(f).  Dr.

Calderón does not allege Sheriff Firman sat on the Commission[7] or that he personally played any role in regard to the contract.  Even taking Dr. Calderón's allegation that Sheriff Firman's statements after Dr. Calderón was not awarded the contract were an "acknowledgement of wrongdoing" on the part of the Sheriff's Office, *id.,* Dr. Calderón has not alleged any action that Sheriff Firman took in connection with the alleged violation of her constitutional rights.  As such, he cannot be a cause in fact of the alleged violation.  The Court will dismiss Dr. Calderón's First Amendment claim against Sheriff Firman.

### iv. Jess Vigil

The amended complaint alleges that defendant Vigil "was the Deputy Manager of Public Safety in the Department of Public Safety for the City of Denver," *id.* at 2, ¶ 5; that Mr. Vigil stated that the City was planning to take CRP's contract away and that Dr. Calderón had brought the termination of the CRP contract on herself, *id.* at 11, ¶ 39; and that Mr. Vigil emailed with other officials in the Mayor's Office about terminating Dr. Calderón's and CRP's contract.  *Id.* at 10-11, ¶ 38.  Dr. Calderón also alleges that Mr. Vigil's department put out the RFP, *id.* at 11, ¶ 41, and that Mr. Vigil spread rumors

---

[7] Plaintiff's response argues that Sheriff Firman was on the Crime Prevention and Control Commission, Docket No. 78 at 9; however, the amended complaint only states that the Sherriff's Office had a seat on the Commission.  Docket No. 62 at 7, ¶ 27.  "On a 12(b)(6) motion to dismiss, the Court looks to the factual allegations made within the pleadings and not in other filings with the Court."  *Stratton v. United Launch All., L.L.C.*, No. 13-cv-01756-RBJ-KLM, 2014 WL 3644565, at *4 (D. Colo. July 23, 2014) (citing *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994) ("The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."); *E.E.O.C. v. Pitre, Inc.*, 908 F. Supp.2d 1165, 1171 (D.N.M. 2012) ("In considering Rule 12(b)(6) motions, courts must look within the four corners of the complaint, accept all well-pleaded factual allegations as true, and determine if the plaintiff is plausibly entitled to relief.")).

about Dr. Calderón to discredit her.  *See id.* at 11, 17, ¶¶ 42, 54.  Dr. Calderón argues that Mr. Vigil intentionally participated in the scheme to terminate Dr. Calderón's contract, as evidenced by Mr. Vigil's comment to Dr. Calderón that she brought her own termination upon herself.  *See id.* at 11, ¶ 39.  Considering these allegations together, the Court finds that Dr. Calderón has sufficiently pled actions by Mr. Vigil that "set[ ] in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights."  *Metzler v. City of Colo. Springs*, 841 F. App'x 94, 99 (10th Cir. 2021) (unpublished) (quoting *Buck*, 549 F.3d at 1279-80).  The Court will decline to dismiss Dr. Calderón's First Amendment claim against Mr. Vigil for lack of personal involvement.

### v. Andrea Albo

Dr. Calderón alleges that defendant Albo solicited others to submit bids in response to the RFP.  Docket No. 62 at 12, ¶ 43(d)(i).  Dr. Calderón also claims that Ms. Albo participated in spreading rumors about Dr. Calderón in emails that were circulated in the Mayor's Office discussing terminating Dr. Calderón's contract.  *Id.* at 10-11, ¶¶ 38, 42.  Dr. Calderón asserts that Ms. Albo caused her contract to be terminated, based on "agreement and concerted action," *Sonner Prods. Co. v. McBride*, 708 F.2d 510, 512 (10th Cir. 1983), through emails, spreading rumors, and solicitation of alternative bids. *See id.* at 10-11, ¶ 38.  Finding these allegations sufficient to allege personal participation, the Court will decline to dismiss Dr. Calderón's First Amendment claim against Ms. Albo.

### 2. Municipal Liability

Defendants claim that Dr. Calderón's First Amendment claims should be dismissed against the City because Dr. Calderón fails to allege municipal liability. Docket No. 65 at 11-13.  Dr. Calderón responds that she has adequately pled a pattern and practice of the City retaliating against those who are critical of the City or its officials and that the single instance of discrimination against Dr. Calderón is sufficient to establish municipal liability.  Docket No. 78 at 11-13.

Local governments may not be sued under 42 U.S.C. § 1983 on a theory of respondeat superior.  *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 692 (1978). Instead, local governing bodies can be sued directly only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Id.* at 690 (footnote omitted).  "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.* at 694.

In order to state a claim for municipal liability under § 1983 that is based on the actions of a municipal employee, a party must allege sufficient facts to demonstrate that it is plausible (1) that the municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation.  *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004).  A municipal policy or custom can take the form of

> (1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by

written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused.

*Bryson*, 627 F.3d at 788 (10th Cir. 2010) (citations omitted).  Dr. Calderón argues that "[d]efendants City and Hancock have a pattern and practice of retaliating against persons and organizations that have been critical of the City or its officials."  Docket No. 78 at 11.  Alternatively, Dr. Calderón argues the termination of her contract can constitute municipal liability as a single instance because it was the decision of Mayor Hancock, a person with final policymaking authority.  *Id.* at 12.

The amended complaint alleges that "[d]efendants City and [Mayor] Hancock have a pattern and practice of retaliating against persons and organizations that have been critical of the City or its officials, for example, [Mayor] Hancock terminated a deal that the City had reached with a developer because he did not like his social media posts critical of the Mayor's policy positions."  Docket No. 62 at 15, ¶ 46.  Generally, an allegation of one instance of retaliation that is devoid of supporting details is insufficient to constitute a plausible allegation of a pattern or practice that is "so permanent and well settled as to constitute a 'custom or usage' with the force of law."  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 168 (1970).

As noted earlier, Dr. Calderón alleges that Mayor Hancock was the "final decision-maker" on the award of the TJC contract.  Docket No. 62 at 7, ¶ 29. Defendants argue that Dr. Calderón fails to allege that any defendants, including Mayor Hancock, are the final policy makers for contracting in Denver.  Docket No. 65 at 7-8.  In

deciding "whether an individual is legally a final policymaker for a municipality," three factors are considered: (1) "whether the official is meaningfully constrained by policies not of that official's own making;" (2) whether the individual's decision is final or subject to meaningful review; and (3) if the decision "is within the realm of the official's grant of authority." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010).

The amended complaint alleges that the Mayor selects contractors and sends a proposed ordinance with his selection to the City Council in the normal procedure for evaluating contracts.   Docket No. 62 at 6, ¶ 26.  The amended complaint, however, also alleges that Mayor Hancock picks a contractor as the "final decision-maker," *id.* at 7, ¶ 29, because "the City Council does not question the Mayor's choice and rubber-stamps his decision regarding contractors."  *Id.*, ¶ 28.  The amended complaint alleges that the selection of a contractor is an executive decision affecting the City of Denver over which the Mayor always had decision-making power.  *Id.*, ¶ 29.  Dr. Calderón has sufficiently alleged that Mayor Hancock was not constrained in his choice or subject to meaningful review and that it was within the authority of the Mayor to make these decisions.  Taking these allegations as true, Dr. Calderón has sufficiently alleged municipal liability, and the Court will not dismiss the City as a defendant.

## C.  Fourteenth Amendment Claim

Defendants argue that Dr. Calderón's Fourteenth Amendment claim fails for three reasons: (1) she has not alleged that she was treated differently than similarly situated persons; (2) she has not pled a discriminatory effect or a discriminatory

purpose; and (3) she has not shown that the law was clearly established at the time of any violations.[8]  Docket No. 65 at 13-14.

The Fourteenth Amendment "prohibits state and local governments from treating similarly situated persons differently."  *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 949 (10th Cir. 2003).  "The prima-facie case required to support a claim of intentional

---

[8] Defendants' argument that plaintiff does not show that "the law was clearly established," Docket No. 65 at 14, is an underdeveloped qualified immunity argument. The Court will decline to perform a qualified immunity analysis based on this cursory argument contained in part of one sentence in defendants' motion.  In *Tillmon v. Douglas County*, 817 F. App'x 586, 589 (10th Cir. 2020) (unpublished), the Tenth Circuit considered an interlocutory appeal of the district court's decision not to rule on the defendants' qualified immunity defense.  The court explained that, "if a defendant adequately raises qualified immunity and the district court declines to rule on the defense, then we typically remand and direct the district court to decide qualified immunity.  But if a defendant does not adequately present the defense to the district court, then the defense is not preserved for appellate review and we affirm the district court."  *Id.* (citations omitted).  The court found that, although the defendants argued on appeal that they had "adequately raised qualified immunity in their motion to dismiss," their "analysis of qualified immunity in th[e] motion was cursory at best" because their "argument consisted of a single paragraph briefly discussing the law of qualified immunity."  *Id.*; *see also Riley v. Spangler*, 2021 WL 5881999, at *8 (D.N.M. Dec. 13, 2021) ("The Tenth Circuit has previously found that a defendant's argument focusing on whether a constitutional violation occurred does not raise a qualified immunity defense." (collecting cases)); *A Brighter Day, Inc. v. Barnes*, 860 F. App'x 569, 575-76 (10th Cir. 2021) (unpublished) (finding one-sentence qualified immunity argument "underdeveloped" and declining to review the merits because it "was neither pressed nor passed upon"); *Halik v. Darbyshire*, No. 20-cv-01643-PAB-KMT, 2021 WL 4305011, at *4 (D. Colo. Sept. 22, 2021) (declining to consider qualified immunity argument since it was insufficiently raised); *cf. Tele-Communications, Inc. v. Comm'r*, 104 F.3d 1229, 1233 (10th Cir. 1997) (finding an argument underdeveloped when "[o]nly the final three sentences in [the relevant] paragraph ma[d]e any argument whatsoever"); *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("The court will not consider 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation.'") (citation omitted).

discrimination under the Equal Protection Clause varies based on the context and nature of the facts." *Morman v. Campbell Cnty. Mem'l Hosp.*, 632 F. App'x 927, 934 (10th Cir. 2015) (unpublished).  A plaintiff who brings an equal protection claim must show that she was treated differently than similarly situated employees.  *Id.*  A complaint that fails to plausibly allege a plaintiff is similarly situated to relevant comparators in all material respects cannot survive a motion to dismiss.  *Id.* at 935.  Additionally, a plaintiff raising an equal protection claim must demonstrate discriminatory intent.  *Watson v. City of Kansas City, Kan.*, 857 F.2d 690, 694 (10th Cir. 1988).  This does not require plaintiff to "demonstrate that the challenged action was taken solely for discriminatory purposes; it is necessary only to prove that a discriminatory purpose was a motivating factor."  *Id.* (citing *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265 (1977)).

Dr. Calderón argues that she was treated differently from male applicants for the TJC contract.  Docket No. 78 at 13.  The amended complaint alleges that Dr. Calderón was not notified that a request for proposals had been sent out when other candidates were so notified.  Docket No. 62 at 6, ¶ 24.  In addition, the amended complaint alleges that she was the only female applicant for the TJC, *id.*, ¶ 25, defendants discredited Dr. Calderón as an applicant for the contract with false statements about her performance and rumors and false statements about her personal life, *id.* at 11, 14, ¶¶ 42, 43(h), and defendants chose a male-managed coalition as the TJC contractor.  *Id.* at 7, ¶ 30.  The amended complaint, however, does not allege that she was not picked because of her gender.  Although the amended complaint alleges that she was treated differently from male applicants, it fails to allege that gender was the basis of any discriminatory intent

28

against her.  Rather, the amended complaint alleges that defendants did not award the TJC contract to Dr. Calderón and CJP to retaliate against Dr. Calderón for her speech, as discussed in Section III.B.1. above.  Taking all of Dr. Calderón's allegations as true, the amended complaint fails to allege that discriminatory intent as opposed to a retaliatory intent was a motivating factor in the decision not to award her the TJC contract, a necessary element of her Fourteenth Amendment claim.  Therefore, the Court will dismiss this claim.

### D. Conspiracy

Dr. Calderón alleges that defendants "act[ed] in concert for the purpose of depriving Dr. Calderón of the government contract that she had held for almost a decade and discriminating against her on the basis of gender."  Docket No. 62 at 20, ¶ 69.  Defendants argue Dr. Calderón's conspiracy claim should be dismissed because Dr. Calderón does not allege a meeting of the minds or concerted action by defendants to violate Dr. Calderón's rights.  Docket No. 65 at 14.

A claim for a conspiracy to deprive a plaintiff of her constitutionally protected rights is actionable under § 1983.  *Snell*, 920 F.2d at 701.  A plaintiff must demonstrate: (1) a conspiracy, (2) an actual deprivation of her constitutional rights, and (3) action under color of state law.  *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 n.6 (10th Cir. 1990); *see also Leatherwood v. Rios*, 705 F. App'x 735, 739 (10th Cir. 2017) (unpublished).  Additionally, "the conspiracy claim allows for imputed liability; a plaintiff may be able to impose liability on one defendant for the actions of another performed in the course of the conspiracy."  *Dixon*, 898 F.2d at 1449 n.6.  "The participants in the conspiracy must share the general conspiratorial objective," but "[a]n express

agreement among all the conspirators is not a necessary element" of a § 1983 conspiracy claim; "it simply must be shown that there was a single plan, the essential nature and general scope of which was know[n] to each person who is to be held responsible for its consequences."  *Snell*, 920 F.2d at 702 (citation and quotation omitted).

Here, because Dr. Calderón has failed to allege a Fourteenth Amendment violation, her Fourteenth Amendment claim cannot serve as the basis of a conspiracy claim.  As to her First Amendment claim, the amended complaint alleges that Ms. Albo, Mr. Vigil, and Ms. Huerter discussed Dr. Calderón's termination via email in June 2017, Docket No. 62 at 10-11, ¶ 38, that Mr. Vigil spoke to Mayor Hancock and Ms. Huerter about terminating Dr. Calderón's contract based on her activism, and that Mr. Vigil said Dr. Calderón deserved to lose her contract, *id.* at 11, ¶ 39, that Mayor Hancock "stated that he was 'personally offended' and 'stung'" by Dr. Calderón's criticism at a meeting with Ms. Albo and Sheriff Firman, among others, *id.* at 10, ¶ 36, and that defendants set up the RFP process to effectuate their goal of terminating Dr. Calderón's contract.  *Id.* at 12, ¶ 43.  The amended complaint additionally asserts that Ms. Albo and Mr. Vigil spread rumors about Dr. Calderón to discredit her, *id.* at 17, ¶ 54, that Ms. Huerter and Ms. Albo actively recruited other applicants for the RFP even though the Sherriff's Department was to "stay clear" of the RFP proceedings, *id.* at 12, ¶ 43(d), that Ms. Huerter falsely claimed Dr. Calderón's organization had failed to perform under its contract, *id.* at 14, ¶ 43, and that these actions culminated in Mayor Hancock selecting a

different contractor on November 6, 2017 and Dr. Calderón losing the CRP contract she worked under.  *Id.*, ¶ 44.

Considering these allegations cumulatively, Dr. Calderón has sufficiently alleged that all the defendants shared the conspiratorial objective, namely, terminating the CRP contract to retaliate against Dr. Calderón.  The amended complaint alleges that the decision to put the TJC contract up for a bid was designed to punish Dr. Calderón.  She has alleged that each defendant took steps in support of this goal throughout the RFP and selection process.  It is not necessary that she plead an express agreement between all the defendants.  Dr. Calderón has alleged that each defendant took actions intending to terminate the CRP contract and that such actions were taken to retaliate against Dr. Calderón.

Regarding Sheriff Firman, who is not individually liable, Dr. Calderón argues that he can still be held liable for a conspiracy.  Docket No. 78 at 14-15.  "[A] plaintiff may be able to impose liability on one defendant for the actions of another performed in the course of a conspiracy."  *Bledsoe*, 53 F. 4th at 609 (quoting *Dixon*, 898 F.2d at 1449 n.6).  A plaintiff must "allege specific facts showing an agreement and concerted action among defendants. . . .  However, because direct evidence of an agreement to join a conspiracy is rare, a defendant's assent can be inferred from acts furthering the conspiracy's purpose."  *Id.* (internal citations, quotations, and alterations omitted).  "[P]articipants in the conspiracy must share the general conspiratorial objective."  *Id.* (quoting *Frasier v. Evans*, 992 F.3d 1003, 1024 (10th Cir. 2021)).  As discussed above, the amended complaint does not allege that Sheriff Firman played any role in the decision not to renew CRP's contract.  The amended complaint alleges that Sheriff

Firman tried to cover up wrongdoing after the violation occurred, but without any allegation that Sheriff Firman took any action before Dr. Calderón's contract was terminated.  Thus, the amended complaint lacks plausible allegations that Sheriff Firman influenced or participated in the decision to terminate the CRP.  *See Janny v. Gamez*, 8 F.4th 883, 924 (10th Cir. 2021) (observing that in order to show a defendant "joined [a] conspiracy" a plaintiff must show the defendant "participated in or influenced the challenged decision" (quoting *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1454 (10th Cir. 1995)).  Because Dr. Calderón does not allege Sheriff Firman's specific participation in the conspiracy, the Court will dismiss Dr. Calderón's claims regarding Sheriff Firman in the portion of her conspiracy claim that alleges a conspiracy to violate Dr. Calderón's First Amendment rights.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendants' Motion to Dismiss Amended Complaint [Docket No. 65] is **GRANTED** in part and **DENIED** in part.  It is further

**ORDERED** that plaintiff's first claim for violations of her First Amendment rights is **DISMISSED with prejudice** against defendant Patrick Firman.  It is further

**ORDERED** that plaintiff's second claim for violations of her Fourteenth Amendment rights is **DISMISSED with prejudice**.  It is further

**ORDERED** that plaintiff's third claim for conspiracy under § 1983 is **DISMISSED with prejudice** against defendant Patrick Firman and **DISMISSED with prejudice** to the extent it is predicated on a conspiracy to violate plaintiff's Fourteenth Amendment rights.

DATED August 21, 2023.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge