IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 18-cv-00756-PAB-CYC

LISA CALDERÓN,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER,
MICHAEL HANCOCK,
JESS VIGIL,
ANDREA ALBO, and
REGINA HUERTER,

      Defendants.

_____

**ORDER**
_____

      The matter before the Court is Defendants' Motion for Summary Judgment

[Docket No. 148].  Plaintiff Lisa Calderón filed a response, Docket No. 156, and

defendants replied.  Docket No. 163.  Dr. Calderón filed a surreply on April 17, 2025.

Docket No. 165-1.[1]  The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

_____

[1] On April 17, 2025, Dr. Calderón filed a motion for leave to file a surreply.
Docket No. 165.  In her motion, Dr. Calderón maintains that defendants raise three new
arguments in their reply.  *Id.* at 1-4.  Specifically, she claims that defendants argue, for
the first time, that (1) they are entitled to qualified immunity, (2) the Denver city charter
identifies the city council as the final policymaker on Dr. Calderón's contract with the
city, and (3) Dr. Calderón cites redacted emails that do not properly support her
assertions of fact.  *Id.*  The Court is not persuaded that the first and second arguments
are raised for the first time in defendants' reply.  *See* Docket No. 148 at 13, 19
("Because each individual Defendant has asserted the defense of qualified immunity"
and "the Denver Charter gives final authority to the City Council, not the Mayor").
Moreover, Dr. Calderón fails to explain why defendants may not properly object to the
evidence she relies on in her response without requiring her to file a surreply, given that
defendants' objection is based on the elements of Dr. Calderón's evidence that were

## I.  LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A disputed fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quotations omitted).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotations omitted).  "To avoid summary

---

apparent at the time she filed her response.  *See* Docket No. 165.  Nevertheless, because these issues are relevant to the Court's resolution of defendants' motion, the Court will consider Dr. Calderón's surreply.

judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case."[2] *Bausman*, 252 F.3d at 1115.  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  *Id.*

## II.  BACKGROUND

### A.  Procedural History

On April 2, 2018, Dr. Calderón filed suit against the City and County of Denver ("Denver"), Michael Hancock, Patrick Firman, Jess Vigil, and Andrea Albo.  Docket No. 1.  Dr. Calderón brought two claims for relief under 42 U.S.C. §1983 for alleged violations of her constitutional rights protected by the First and Fourteenth Amendments.  *Id.* at 13-15, ¶¶ 45-52.  On June 16, 2021, Dr. Calderón filed an amended complaint, which included Regina Huerter as a defendant and which added a claim of civil conspiracy.  Docket No. 62 at 1, 20, ¶¶ 68-71.  On July 9, 2021, defendants moved to dismiss Dr. Calderón's complaint.  Docket No. 65.  On August 21, 2023, the Court granted in part and denied in part defendants' motion to dismiss.  Docket No. 80.  Specifically, the Court dismissed Dr. Calderón's claims against Mr. Firman, dismissed Dr. Calderón's second claim for violations of the Fourteenth

---

[2] Defendants appear to identify the wrong standard for summary judgment. Docket No. 163 at 3-4.  They claim that, "[w]hile the burden is on the Plaintiff to demonstrate specific facts supporting her claims, she has done nothing more than produce facts which both parties agree are in dispute.  Accordingly, she has not sufficiently demonstrated that she can prove any specific facts upon which a trier of fact could rule in her favor and summary judgment must therefore issue to Defendants."  *Id.* Because defendants move for summary judgment, it is their burden to prove that the undisputed facts demonstrate that they are entitled to judgment as a matter of law.  To survive summary judgment, Dr. Calderón only needs to produce evidence sufficient to establish an inference of the presence of each element essential to her claim and that there is a dispute of material fact that should be resolved by a jury.  *Bausman*, 252 F.3d at 1115.

Amendment, and dismissed Dr. Calderón's civil conspiracy claim to the extent she
alleged a conspiracy to violate the Fourteenth Amendment. *Id.* at 32.

On October 6, 2023, Dr. Calderón filed a third amended complaint that brings a
claim for violations of her First Amendment rights and a claim of civil conspiracy against
Denver, Mayor Hancock, Mr. Vigil, Ms. Albo, and Ms. Huerter. Docket No. 99 at 21-22,
¶¶ 72-79. On February 21, 2025, defendants moved for summary judgment on Dr.
Calderón's claims. Docket No. 148. On April 4, 2025, Dr. Calderón responded, Docket
No. 156, and defendants replied. Docket No. 163. On April 17, 2025, Dr. Calderón filed
a motion for a surreply, Docket No. 165, and a proposed surreply. Docket No. 165-1.

**B. Undisputed Facts[3]**

The Crime Prevention and Control Commission ("CPCC") was created by the
City and County of Denver ("Denver") in 2005. Docket No. 148 at 1, ¶ 1. By ordinance,
the CPCC consists of thirty-three individual members. *Id.*, ¶ 2. The CPCC's members
are either designated by their position within Denver government or are appointed by
the mayor. *Id.* The Denver Sheriff sits on the CPCC by ordinance. *Id.* at 6, ¶ 26.

The Community Reentry Project ("CRP") was one of many initiatives started by
the CPCC. *Id.* at 2-3, ¶ 3. The CRP was intended to provide services to individuals
leaving the jail system and re-entering the community. *Id.* These services are known
as Transition from Jail to Community ("TJC") services or reentry services. *Id.* During
the relevant period, CRP was part of an organization known as the Colorado Nonprofit
Development Center ("CNDC"), which acted as CRP's fiscal sponsor and exercised

---

[3] The following facts are undisputed unless indicated otherwise.

legal and managerial control over CRP.[4]  *Id.* at 2, ¶ 4.  All CRP staff were employees of

CNDC.[5]  *Id.*

      From January 1, 2013 to December 31, 2017, CNDC held the contract with

Denver by which CRP performed TJC services.[6]  *Id.*, ¶ 5.  The CNDC contract expired

on December 31, 2017.  *Id.*  The contract contained a clause specifying that CNDC was

a Denver contractor.  *Id.*

      In January 2012, Executive Order 8B ("EO8") went into effect.  *Id.*, ¶ 6.  EO8

provided that, absent special circumstances, all Denver contracts should be put out for

competitive bidding every three to five years.  *Id.*  In 2016, oversight of CRP moved

---

[4] Defendants do not define the relevant period.  However, for the reasons discussed below, it is an undisputed fact that CNDC exercised control over CRP from 2013 until CRP dissolution in 2017.  The Court finds that 2013 to 2017 is the relevant period.

[5] Dr. Calderón denies this fact.  Docket No. 156 at 1-2, ¶ 4.  Dr. Calderón states that "CRP was not a part of CNDC; it was always a City project, with administrative services provided by various fiscal agents, including CNCD."  *Id.*  Dr. Calderón's support for her denial demonstrates only that CRP was a project managed by CNDC; it does not dispute that CRP staff were CNCD employees.  *See* Docket 159-9 at 185; Docket No. 159-3 at 6, 16:1-25; Docket No. 157-1 at 10, 33:11-25.  Moreover, defendants' evidence indicates that CNDC projects were considered part of CNDC.  Docket No. 148-6 at 1 ("The projects of CNDC, including the Project, are not discrete entities; rather, they are consistent parts of CNDC's corporate structure.").  Therefore, it is undisputed that CRP staff were employees of CNDC.

[6] Defendants assert that "CNDC held the contract with Denver by which CRP performed TJC services."  Docket No. 148 at 2, ¶ 5.  Dr. Calderón disputes this fact, stating that Denver "contracted with three different fiscal agents for CRP over the years."  Docket No. 156 at 2, ¶ 5.  Dr. Calderón cites defendants' interrogatory responses, in which they state that Denver contracted for reentry services first with the Bo Matthews Center for Excellence "from January 1, 2009 through December 31, 2009; that the City subsequently contracted with Mile High Council on Alcoholism and Drug Abuse to provide reentry or TJC services from January 1, 2010 through December 31, 2012; and, that the City contracted with CNDC to provide TJC services from January 1, 2013 through December 31, 2017."  Docket No. 159-10 at 10.  Denver does not respond to Dr. Calderón's denial.  *See* Docket No. 163.  Therefore, the Court finds that it is an undisputed fact that CNDC held the contract to provide TJC services from January 1, 2013 through December 31, 2017.

from the Denver Department of Safety ("DOS") to the Denver Department of Human

Services ("DHS").  *Id.*, ¶ 7.  Soon thereafter, DHS determined that the contract for TJC

services was past due for a competitive bid.  *Id.*  On October 24, 2016, DHS formed a

request for proposal ("RFP") task force for the purpose of preparing for an RFP.  *Id.*  In

addition, the CPCC began discussing the need for an RFP for reentry services

beginning in 2016.  *Id.*  DHS issued an RFP on July 31, 2017.[7]  *Id.* at 3, ¶ 9.  The RFP

was sent to multiple individuals via email and published in the Daily Journal, as well as

on denvergov.org.  *Id.*  The RFP states that the executive director of DHS has the

authority to make the "final determination of the successful proposers and dollar amount

of the contracts."[8]  *Id.*

        Dr. Calderón was on the email distribution list for the RFP.  *Id.*, ¶ 10.  However,

her email address was corrupted, and she did not receive a copy of the RFP the day it

---

[7] Dr. Calderón asserts that the "Mayor's Chief of Staff and others in his office
were highly involved in the drafting of the RFP."  Docket No. 156 at 8, ¶ 16.  Dr.
Calderón's only support for this assertion is to "see above."  *Id.*  Above Dr. Calderón
discusses Mayor Hancock's discussion with Mr. Gonzales.  *Id.*, ¶ 15.  This does not
support the assertion that Mayor Hancock's chief of staff was involved in drafting the
RFP.  Dr. Calderón also asserts that the chief of staff's involvement was "highly
unusual."  *Id.*, ¶ 16.  Dr. Calderón cites deposition testimony by Mr. Salazar.  *Id.*  During
his deposition, Mr. Salazar describes the ordinary process in the mayor's office for
approving a contract in which he states that it is unusual for a chief of staff to be
involved.  *See* Docket No. 159-3 at 4, 9:17-19.  This does not support the assertion that
Mayor Hancock's chief of staff was involved in the RFP process.  Dr. Calderón also
cites deposition testimony that she fails to include in her exhibit of deposition excerpts.
*See* Docket No. 156 at 8, ¶ 16 (citing deposition pages 11:15-12:5).  Because Dr.
Calderón fails to properly support her assertion that the chief of staff was involved in the
drafting of the RFP, the Court will not consider this fact.
[8] Dr. Calderón denies that the executive director of DHS has "final authority" on
Denver contracts, which she claims belongs to the mayor.  Docket No. 156 at 2, ¶ 9.
Dr. Calderón does not deny that defendants accurately quote the RFP.  *See id.*; *see
also* Docket No. 148-11 at 6.  Therefore, the Court finds that it is an undisputed fact that
the RFP identifies the executive director of DHS as having the authority to make a final
determination of the successful proposers and dollar amounts of the contracts.

was issued.  *Id.*  Dr. Calderón sent an email to CRP staff at 7:34 a.m. on August 1, 2017

regarding the RFP.  *Id.*  CNDC, as the fiscal sponsor of CRP, submitted a timely

application for the RFP.  *Id.*, ¶ 11.

In response to the RFP, DHS received six bids.  *Id.*, ¶ 12.  On September 26,

2017, after initial vetting by DHS, a review panel of eight community members

considered and ranked the six responsive bids.[9]  *Id.* at 3-4, ¶ 13.

At the CPCC meeting on October 18, 2017, the three top candidates were

permitted to address the commission and support their proposals.  *Id.* at 4, ¶ 14.  Dr.

Calderón presented on behalf of CNDC and CRP.  *Id.*  Thereafter, the CPCC voted on

the submissions.  *Id.*  CNDC and CRP received nine votes, and Servicios de la Raza

("Servicios") received 11 votes.  *Id.*  The CPCC passed a motion to recommend that

Servicios be declared the successful bidder.  *Id.*  No individual, group of individuals,

Denver agency, or Denver department exerted undue influence on the CPCC vote

regarding the RFP.[10]  *Id.*, ¶ 15.

---

[9] Dr. Calderón does not deny this fact.  Docket No. 156 at 2, ¶ 13.  However, in
her response, she states that the "the members were not average community members,
for example two were from the Colorado Department of Corrections."  *Id.*  To the extent
Dr. Calderón claims that it is an undisputed fact that the review panel did not consist of
community members, Dr. Calderón should have included this fact as part of a statement
of additional undisputed facts.  *See* Practice Standards, (Civil Cases), Chief Judge
Philip A. Brimmer, § III.F.3.b.iv.  Alternative, she should have incorporated this fact in
her statement of additional disputed facts.  *See Id.*, § III.F.3.b.v.  Because she did
neither, the Court will not consider this fact.

[10] Dr. Calderón denies this fact.  Docket No. 156 at 2, ¶ 15.  She claims that, at
the CPCC meeting, Sheriff Patrick Firman, Louise Boris, who was a Servicios
employee, and Del Philips, who wrote a letter supporting Servicios, "attended the
meeting and the discussion in executive session but did not vote."  *Id.*  Dr. Calderón
cites the meeting minutes of the October 18, 2017 CPCC meeting, during which the
CPCC voted on who would be awarded the contract to provide TJC services.  Docket
No. 159-9 at 136-37.  The meeting minutes state

On November 16, 2017, the executive director of DHS, Don Mares, was notified

that the CPCC recommended that Servicios be declared the successful bidder.[11]  *Id.*,

¶ 16.  On November 21, 2017, DHS notified CNDC that it was not the successful bidder.

*Id.*, ¶ 17.

Mr. Mares approved the selection of Servicios.[12]  *Id.*, ¶ 18.  According to the

Denver City Charter, the Servicios contract for TJC services required approval by the

---

Representatives and supporters from applications for Transition Jail to
Community (TJC) Reentry were allowed time to make a statement about their
application.  The commission acknowledged speakers and thanked participants
for taking time out of their day.  Patrick Firman, Louise Boris and Del Philips
recused themselves from the vote.  Commissioners went into executive session
to discuss applications, and came out of executive session to vote on award of
TJC RFP.

*Id.* at 136.  The minutes are unclear as to whether Mr. Firman, Ms. Boris, and Mr.
Philips participated in the executive session after they recused themselves.  The
meeting minutes do not support the inference that any of these individuals exerted
undue influence on the other commissioners' votes.  Dr. Calderón also states that Ms.
Huerter attended the meeting.  Docket No. 156 at 2, ¶ 15.  Even considering Dr.
Calderón's assertions of disputed fact regarding Ms. Huerter, discussed below, the
Court does not find that her presence at the meeting demonstrates that she exerted any
influence over the CPCC vote.  Instead, it is an undisputed fact that attendees of the
meeting reported Ms. Huerter remained neutral and objective throughout the
proceedings.  Docket No. 148 at 7, ¶ 32.  Therefore, the Court finds that it is an
undisputed fact that no one exerted undue influence on the CPCC vote regarding the
RFP.

[11] Dr. Calderón does not respond to defendants' assertion of fact.  *See* Docket
No. 156 at 1-2.  The Court practice standards require the responding party to either
admit or deny each assertion of fact.  Practice Standards, (Civil Cases), Chief Judge
Philip A. Brimmer, § III.F.3.b.iv.  If a party "fails to properly address another party's
assertion of fact as required by Rule 56(c), the court may . . . consider the fact
undisputed for purposes of the motion" and may "grant summary judgment if the motion
and supporting materials – including the facts considered undisputed – show that the
movant is entitled to it."  Fed. R. Civ. P. 56(e)(2)–(3); Practice Standards, (Civil Cases),
Chief Judge Philip A. Brimmer, § III.F.3.b.ix.  Therefore, the Court deems this fact to be
admitted.

[12] Dr. Calderón both admits this fact, *see* Docket No. 156 at 1 ("Defendants'
statements of undisputed facts numbered 1, 2, 3, 6, 7, 8, 10, 11, 12, 14, 18, 17, 22, 23,
24, 33, 35, 37, 39 and 40 are undisputed."), and denies this fact.  *Id.* at 2, ¶ 18

city council because the contract value exceeded $500,000.[13]  *Id.* at 4-5, ¶ 19.  The

mayor, defendant Michael Hancock, signed the Servicios contract.  *Id.* at 5, ¶ 20.

In June 2017, Shelley Siman,[14] who was then engaged to defendant Jess Vigil,[15]

remembers Mr. Vigil forwarding her an email wherein individuals were discussing ways

to end "Lisa's contract" legitimately.  *Id.*, ¶ 21.  According to Ms. Siman, the email was

between a member of the City Attorney's Office, defendant Andrea Albo,[16] Mr. Vigil and

Ms. Huerter.[17]  *Id.*  Along with the email, Ms. Siman remembers that Mr. Vigil expressed

to her his belief that Dr. Calderón "had brought the action" upon herself because of the

way she had been behaving.  *Id.*  Mr. Vigil's comment was his personal opinion.[18]  *Id.*

Mr. Vigil was not involved with CRP.  *Id.* at 7-8, ¶ 36.

---

("Disputed in that the contract process also included approval of the Mayor, the final
authority.").  Therefore, the Court assumes that Dr. Calderón denies this fact.  However,
Dr. Calderón's denial is not responsive to defendants' assertion of fact, and the Court
therefore deems this fact to be undisputed.

[13] The parties dispute whether the mayor had "final approval" over the Servicios
contract and whether Mayor Hancock's signature was "ministerial" in nature.  *See*
Docket No. 148 at 4-5, ¶¶ 18-20; Docket No. 156 at 2-3, ¶¶ 18-20.  To the extent the
parties dispute whether the mayor has final policy-making authority regarding the
selection of Servicios, this is a question of law, not fact.  *Randle v. City of Aurora*, 69
F.3d 441, 447 (10th Cir. 1995) (the "question of whether an official has 'final
policymaking authority' is a question of state law").  However, for the reasons discussed
below, the Court does not find that it is necessary to resolve this legal issue.  Moreover,
there is no dispute that Mayor Hancock participated in the approval process for the
Servicios contract because it is an undisputed fact that he signed the Servicios contract.

[14] The parties include no undisputed facts as to who Ms. Siman is.  In the
argument section of her response, Dr. Calderón states that Ms. Siman worked for
defendant Regina Huerter.  Docket No. 156 at 13-14.

[15] Mr. Vigil was the Deputy Manager of Public Safety.  Docket No. 148 at 7-8,
¶ 36.

[16] Ms. Albo was the Chief of Staff at the Denver Sheriff's Department ("DSD").
Docket No. 148 at 6, ¶ 25.

[17] Ms. Huerter was the Executive Director of CPCC.  Docket No. 148 at 7, ¶ 31.

[18] Defendants assert that Mr. Vigil comment "was his personal opinion and was
not based on any knowledge he obtained from any City source."  Docket No. 148 at 5,
¶ 21.  Dr. Calderón denies this fact.  Docket No. 156 at 3, ¶ 21.  Dr. Calderón argues

On June 27, 2017, Mr. Vigil sent a text to Ms. Siman sharing a rumor that Dr. Calderón was having an affair with former Sheriff Gary Wilson. *Id.* at 5, ¶ 22. Ms. Albo heard the rumor regarding Dr. Calderón and Gary Wilson from a consultant and discussed the rumor during a telephone call among Denver employees. *Id.* at 5-6, ¶ 23. Beginning in 2016, Dr. Calderón began having a relationship with DSD Captain Shayne Grannun. *Id.* at 6, ¶ 24. She did not have a relationship with Mr. Wilson. *Id.*

Ms. Albo was chief of staff at DSD during the RFP process and during the Servicios contracting process. *Id.*, ¶ 25. Ms. Albo was not part of the decision-making

---

that there is an inference that Mr. Vigil's statement was based on information he obtained from a Denver source. *Id.* Dr. Calderón cites two sets of email chains. *See, e.g.*, Docket No. 159-9 at 157-58. The emails have the subject line "Confidential Attorney Client Privilege – Contract Review." *See id.* at 157. The contents of the emails are completely redacted. *Id.* Dr. Calderón filed a motion to compel the disclosure of unredacted versions of these emails, arguing that the crime-fraud exception to attorney-client privilege applies in this case. *See* Docket No. 128. In her surreply, Dr. Calderón maintains that it would be unfair for defendants to object to her evidence on the basis that the evidence is redacted. Docket No. 165-1 at 3-4. However, on May 30, 2025, Magistrate Judge Cyrus Chung denied the motion to compel because Dr. Calderón failed to demonstrate that the crime-fraud exception applies here. Docket No. 168 at 3-6. Moreover, Dr. Calderón cites no authority for the proposition that the Court may speculate about the contents of the emails because the emails were redacted to protect attorney-client privilege. The Court finds that emails provide no support for Dr. Calderón's assertion of fact because the contents of emails are unclear, considering only the emails' dates, recipients, and subject lines. Dr. Calderón also relies on Mr. Vigil's deposition testimony, in which he states that he participated in a conference call, the subject of which was the RFP for TJC services. *See* Docket No. 156 at 3, ¶ 21. In his deposition, Mr. Vigil stated that, although he was asked to cover for another employee by attending this meeting, he joined the conference call late and after the discussion had concluded. *See* Docket No. 148-25 at 4, 40:2-5. He also testified that any opinion he gave to Ms. Siman was his own speculation. *Id.* at 6, 47:20-25. The Court finds that this evidence is sufficient to create an inference that Mr. Vigil's knowledge of the RFP came from a "City source." Docket No. 148 at 5, ¶ 21. However, the evidence is insufficient to raise the further inference that his comment regarding why defendants may have been seeking to end CRP's contract was based on his participation in the RFP process.

process regarding the RFP, although she was aware that the RFP would be issued.[19]
*Id.*  No one asked Ms. Albo to review the RFP, and she had no interaction with the
mayor's office regarding the RFP.[20]  *Id.*  Ms. Albo was not involved in the contracting
process with Servicios.  *Id.*  Prior to the RFP vote, at Ms. Albo's suggestion, DSD
recused itself from the RFP process.[21]  *Id.*, ¶ 26.

---

[19] Dr. Calderón denies this fact.  Docket No. 156 at 3, ¶ 25.  She states that Ms.
Albo "was included in emails with the Mayor's chief of staff and multiple others
regarding the drafting of the RFP."  *Id.*  Dr. Calderón cites two set emails with the
subject line "Confidential Attorney Client Privilege – Contract Review."  *See*, *e.g.*,
Docket No. 159-9 at 157.  One of the emails is sent from the City Attorney's Office to a
recipient in the mayor's office, and Ms. Albo is carbon copied on the email.  *Id.*  The
contents of the emails are entirely redacted.  *Id.*  Any inference by a juror that the
"Contract Review" mentioned in the subject line of the emails refers to the RFP that is
the subject of this litigation or what the contents of these emails might be would require
impermissible speculation.  Therefore, the Court finds that it is an undisputed fact that
Ms. Albo was not part of the decision-making process.

[20] Defendants assert that it is an undisputed fact that "[n]o one asked Ms. Albo to
review the RFP and she had no interaction with either the Mayor's Office or the City
Attorney's Office regarding the RFP."  Docket No. 148 at 6, ¶ 25.  Dr. Calderón denies
this fact.  Docket No. 156 at 3, ¶ 25.  She states that Ms. Albo "was included in emails
with the Mayor's chief of staff and multiple others regarding the drafting of the RFP."  *Id.*
Dr. Calderón cites two set emails with the subject line "Confidential Attorney Client
Privilege – Contract Review."  *See*, *e.g.*, Docket No. 159-9 at 157.  One of the emails is
sent from the City Attorney's Office to a recipient in the mayor's office, and Ms. Albo is
carbon copied on the email.  *Id.*  However, the emails are entirely redacted.  *Id.*  The
redacted emails do not support Dr. Calderón's denial.  Dr. Calderón asserts that Ms.
Albo "also participated in emails with defendants Vigil and Huerter discussing the
termination of Dr. Calderón's project because of her speech."  Docket No. 156 at 3,
¶ 25.  Dr. Calderón supports this assertion by citing the testimony of Ms. Siman in which
she states that Mr. Vigil forwarded her an email between Ms. Albo, Mr. Vigil, "Reggie"
and potentially "someone from the City Attorney's Office."  Docket No. 159-5 at 6:
21:21-24.  Ms. Siman states that the email showed that "[t]hey were planning to release
an RFP," "planning to end Lisa's contract," and "trying to end ways to end Lisa's
contract."  *Id.* at 7, 22:17-20.  Viewed in the light most favorable to Dr. Calderón, her
evidence creates a dispute of fact as to whether Ms. Albo interacted with members of
the City Attorney's Office regarding the RFP.

[21] Dr. Calderón denies that DSD recused itself.  Docket No. 156 at 3, ¶ 26.  Dr.
Calderón argues that, based on the same evidence supporting her denial of undisputed
fact twenty-five, Ms. Albo participated in the RFP process.  *Id.*  She claims that Sheriff
Firman also participated in the executive session of the CPCC meeting.  *Id.*  The Court

Mayor Hancock became aware of the RFP after the RFP was issued. *Id.*, ¶ 27.

He was not involved in the RFP selection process. *Id.* Other than signing the Servicios

contract, Mayor Hancock was not involved in the contracting process. *Id.* Mayor

Hancock did not have a conversation with any individual regarding a particular

organization being responsible for implementing TJC services.[22] *Id.*, ¶ 28. Mayor

Hancock was aware of Dr. Calderón's numerous public statements critical of Denver

policies, but he did not consider her comments to be unusual.[23] *Id.* at 7, ¶ 29. Mayor

Hancock was personally offended by some of Dr. Calderón's accusations during an

August 14, 2017 meeting with the Greater Denver Ministerial Alliance.[24] *Id.*, ¶ 30.

---

has found that there is a dispute of fact as to whether Ms. Albo communicated with a member of the City Attorney's Office regarding the RFP. However, even if this fact is true, it does not mean that that Ms. Albo did not recommend that DSD recuse itself from the RFP vote. Moreover, the evidence that Dr. Calderón relies on shows that Sheriff Firman recused himself from the CPCC vote on proposals. Docket No. 159-9 at 136-37. Therefore, the Court finds this fact to be undisputed.

[22] Dr. Calderón denies that Mayor Hancock was not involved in the RFP selection process beyond signing the Servicios contract. Docket No. 156 at 4, ¶¶ 27-28. She claims that Mayor Hancock was "informed about the contracting process as it was occurring" and that he received a letter from Dr. Calderón "relating to concerns about the process prior to signing the contract with La Raza." *Id.,* ¶ 27. Dr. Calderón cites an email sent to Mayor Hancock on August 15, 2017 in which a member of his staff forwarded him and others an email composed by Dr. Calderón regarding the RFP. Docket No. 159-9 at 146. She also cites the October 23, 2017 letter Dr. Calderón sent to Mayor Hancock. Docket No. 159-8 at 20. Neither of these documents raises a dispute of material fact as to whether Mayor Hancock was aware of the RFP before it was issued on July 31, 2017 or whether he was involved in the RFP process beyond signing the Servicios contract.

[23] Defendants assert that Mayor Hancock was not "updated by his staff regarding [Dr. Calderón's] activities." Docket No. 148 at 7, ¶ 29. Dr. Calderón denies this fact, pointing to two instances where members of the mayor's staff forwarded him emails composed by Dr. Calderón that were critical of Denver city government. Docket No. 156 at 4, ¶ 29 (citing Docket No. 159-9 at 146, 160). Viewed in the light most favorable to Dr. Calderón, these communications create a dispute of fact as to whether Mayor Hancock was "updated by his staff" regarding Dr. Calderón's activities.

[24] Defendants state that, while Mayor Hancock was offended by Dr. Calderón's statements, "her comments did not cause him to change his opinion of Calderón."

Ms. Huerter was present as a facilitator when the RFP candidates were interviewed by the review panel. *Id.*, ¶ 31. She did not take part in the interview process or the ranking of the proposals by the review panel. *Id.* Ms. Huerter attended the CPCC meeting during which the CPCC voted to award the RFP to Servicios. *Id.*, ¶ 32. Attendees reported that Ms. Huerter remained neutral and objective throughout the meeting. *Id.* Ms. Huerter did not discuss the RFP or the Servicios contract with individuals in the mayor's office. *Id.*, ¶ 33. Ms. Huerter left Denver employment in November 2017 and was not involved in negotiating or drafting the contract with Servicios. *Id.*, ¶ 35.

Dr. Calderón was employed as the chief of staff for District 9 Councilwoman Candi CdeBaca from July 15, 2019 to July 9, 2021. *Id.* at 8, ¶ 37. On July 15, 2021, Dr. Calderón sent a text to Armando Saldate III, the Assistant Deputy Executive Director for Public Safety, requesting that he facilitate a crime solutions meeting with support from "our D9 [District 9] staff." *Id.* The next day, Mr. Saldate suggested that Dr. Calderón meet the new Community and Government Affairs Manager for Safety. *Id.*, ¶ 38. Dr. Calderón asked if the new manager was a person of color, and Mr. Saldate responded that the new manager was white. *Id.* Dr. Calderón then expressed disappointment that a person of color had not been hired and stated that, because of this, she did not want

---

Docket No. 148 at 7, ¶ 30. Defendants cite Mayor Hancock's deposition, in which he says the same thing. Docket No. 148-22 at 10, 87:9-11. Dr. Calderón denies this fact, relying on other portions of Mayor Hancock's deposition testimony. Docket No. 156 at 4, ¶ 29. Mayor Hancock testified that his staff told him that the August 14, 2017 meeting was the first time they had seen Mayor Hancock agitated at a public meeting. Docket No. 159-7 at 14,78:15-19. The Court finds that Mayor Hancock's testimony is sufficient to create a dispute of fact regarding his opinion of Dr. Calderón after the August 14, 2017 meeting.

to meet with the new manager. *Id.* Dr. Calderón later denied making this statement.[25]
*Id.*

Dr. Calderón's statements were reported to the executive director of the office of human resources and the City Attorney's Office. *Id.*, ¶ 39. It was determined that the matter would be investigated to determine if there had been a violation of the Denver City Council Respectful Workplace Policy ("Workplace Policy"). *Id.* Mark Flynn, a member of the Employment Matters investigation firm, was hired to perform preliminary fact-finding into whether there was a violation of the Workplace Policy. *Id.* at 8-9, ¶ 40. Mr. Flynn determined that the complaint regarding alleged violations of the Workplace Policy was reasonable but that the remarks had no tangible effect "because District 9 did not refuse to meet with the Manager who was the subject of the remarks." *Id.* Mr. Flynn recommended against any additional investigation.[26] *Id.*

---

[25] In her response, Dr. Calderón states that the facts regarding her conversation with Mr. Saldate are "DISPUTED, except that Dr. Calderón did deny making the comments attributed to her." Docket No. 156 at 4, ¶ 38. The Court's practice standards require that "[a]ny denial shall be accompanied by a brief factual explanation of the reason(s) for the denial and a specific reference to material in the record supporting the denial." Practice Standards, (Civil Cases), Chief Judge Philip A. Brimmer, § III.F.3.b.iv. (emphasis omitted). The practice standards explain that "[t]he sole purpose of these procedures is to establish facts and determine which of them are in dispute." *Id.*, § III.F.3.b.vii. Here, Dr. Calderón does not support her denial with any citation to the record. *See* Docket No. 156 at 4, ¶ 38. The Court therefore deems these facts undisputed. However, even if the Court were to assume that Dr. Calderón had not made this comment, the Court finds that this is not a basis to deny summary judgment for the reasons discussed below.

[26] Defendants include no undisputed facts regarding what speech serves as the basis of Dr. Calderón's claims. *See* Docket No. 148 at 1-9. In her response, Dr. Calderón includes twenty-six paragraphs of facts in a Statement of Additional Disputed Facts. Docket No. 156 at 5-9, ¶¶ 1-21. In particular, she asserts that Mayor Hancock appointed Patrick Firman as the new sheriff in the fall of 2015. *Id.* at 6, ¶ 9. Over the next year and a half, Dr. Calderón harshly criticized Sheriff Firman, the equity and diversity within the sheriff's office, and Denver's jail practices. *Id.* Dr. Calderón asserts that, on May 31, 2017, she sent an open email to the mayor's office, the sheriff's office,

### III.  ANALYSIS

Dr. Calderón brings a claim for violation of her First Amendment rights.  Docket No. 99 at 21, ¶¶ 72-75.  Specifically, she alleges that defendants retaliated against her for her speech by "failing to award to Ms. Calderón or failing to renew the TJC contract administered by Ms. Calderón, conducting an illegal investigation of her as a private citizen and damaging her reputation; and placing unconstitutional conditions upon Calderón's receipt of benefits, *i.e.* a City contract."  *Id.*, ¶ 73.  She also brings a claim for civil conspiracy, alleging that, by "acting in concert for the purpose of depriving Ms. Calderón of the government contract that she had held for almost a decade, Defendants violated [Dr.] Calderón's rights under the First Amendment."  *Id.* at 22, ¶ 77.  The Court will first consider whether defendants are entitled to summary judgment on Dr. Calderón's First Amendment retaliation claim.

### A.  First Amendment Retaliation

"[P]ublic employees do not surrender *all* their First Amendment rights by reason of their employment."  *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) (quoting

---

and the media criticizing Sheriff Firman for a lack of Black command staff on the executive leadership team.  *Id.*  Moreover, in June 2017, Dr. Calderón, on behalf of the Colorado Latino Forum, and the Greater Metro Denver Ministerial Alliance began an effort to meet with Mayor Hancock and Denver officials on a variety of issues, including overcrowding and lack of safety in jails, the underrepresentation of people of color in executive positions, and the demotion of a Black chief of police.  *Id.* at 7, ¶ 10.  Dr. Calderón claims that communications between her and Denver officials concerning the requested meeting became heated, and that Mayor Hancock was upset about Dr. Calderón's criticism, describing her as a constant critic.  *Id.*, ¶ 11.  Dr. Calderón asserts that, in April of 2021, she raised concerns about the lack of diversity in the sheriff's office, as well as the poor treatment of inmates and the ability of Denver officials to provide culturally appropriate mental health services to minority inmates.  *Id.* at 9, ¶ 17. Defendants' response to all of Dr. Calderón's twenty-six paragraphs of additional disputed facts is that "Defendants agree with Plaintiff that all facts proposed by her are disputed."  Docket No. 163 at 3.  The Court has considered these disputed facts in determining whether defendants are entitled to summary judgment.

*Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006)).  Rather, "the First Amendment protects a public employee's right . . . to speak as a citizen addressing matters of public concern." *Id*. (quoting *Garcetti*, 547 U.S. at 417).  "The government employer, however, also has a 'countervailing interest in controlling the operation of its workplaces.'" *Id*. (quoting *Lane v. Franks*, 573 U.S. 228, 236 (2014)).  "The problem in any case is to arrive at a balance between the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id*. (quoting *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 568 (1968) (internal alterations omitted)).

"In striking this balance, the First Amendment prohibits public employers from taking adverse action against employees because of their protected speech." *Id*. at 945.  "To determine if an employer's adverse employment action against an employee is an impermissible retaliation under the First Amendment, [courts] apply the *Garcetti/Pickering* test." *Id*. (citing *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014); *Garcetti*, 547 U.S. at 421; *Pickering*, 391 U.S. at 568); *see also Joritz v. Gray-Little*, 822 F. App'x 731, 738 (10th Cir. 2020) (unpublished); *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2424 (2022).  The *Garcetti/Pickering* test has five elements:

1. The protected speech was not made pursuant to an employee's official duties.

2. The protected speech addressed a matter of public concern.

3. The government's interests as an employer did not outweigh the employee's free-speech interests.

4. The protected speech was a motivating factor in the adverse employment action.

5. The defendant would not have made the same employment decision in the absence of the protected speech.

*Lincoln v. Maketa*, 880 F.3d 533, 538 (10th Cir. 2018) (quoting *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009)); *see also Joritz*, 822 F. App'x at 738; *Knopf*, 884 F.3d at 945; *Helget v. City of Hays, Kansas*, 844 F.3d 1216, 1221 (10th Cir. 2017).  "The first three elements are issues of law for the court to decide, while the last two are factual issues typically decided by the jury."  *Knopf*, 884 F.3d at 945 (quoting *Trant*, 754 F.3d at 1165).

In their motion for summary judgment, defendants do not challenge whether Dr. Calderón's speech was made pursuant to her official duties or whether her criticisms addressed a matter of public concern.  See Docket No. 148 at 9.  Instead, defendants argue only that Dr. Calderón cannot establish the fourth and fifth elements of her retaliation claim, i.e. whether Dr. Calderón's speech was a motivating factor in the adverse employment action and whether Denver would have made the same employment decision in the absence of the protected speech.  *Id.* ("Without conceding that the other elements are met, this motion will focus on elements four and five of *Garcetti/Pickering*.").  Therefore, the Court will consider only whether a reasonable juror could infer the existence of the fourth and fifth elements of the *Garcetti/Pickering* test from Dr. Calderón's evidence of retaliation regarding the 2017 TJC contract and 2021 workplace investigation.

### 1.  TJC Contract

Defendants claim that Dr. Calderón cannot prove the fourth element of the *Garcetti/Pickering* test regarding Denver's termination of the CRP project because she cannot prove that her speech was causally connected to Denver awarding the TJC

contract to Servicios.  *Id.* at 11-12.  "Under the fourth-prong of *Garcetti,* plaintiffs bear

the burden of establishing both a detrimental employment decision (adverse

employment action) and 'causation – that is, that the constitutionally protected speech

was a substantial motivating factor in the employer's decision to adversely alter the

employee's conditions of employment.'"  *Couch v. Bd. of Trustees of Mem'l Hosp. of*

*Carbon Cnty.*, 587 F.3d 1223, 1236 (10th Cir. 2009) (citing *Maestas v. Segura,* 416 F.3d

1182, 1188 & n.5 (10th Cir. 2005)).  "What constitutes a substantial motivating factor

evades precise definition."  *Maestas*, 416 F.3d at 1188.  An employee "need not prove

that [her] speech was the sole reason for defendants' action."  *Copp v. Unified Sch.*

*Dist. No. 501,* 882 F.2d 1547, 1553 (10th Cir. 1989).  "Nor is the employee required to

show 'but-for' causation; that is, to demonstrate but-for the employee's speech the

subsequent employment action would not have occurred."  *Maestas*, 416 F.3d at 1188

(citing *Spiegla v. Hull,* 371 F.3d 928, 941–43 (7th Cir. 2004)).  "Rather, the employee

must show the protected speech played a substantial part in the employer's decision to

adversely alter the employee's conditions of employment."  *Id.* (emphasis omitted).

Although "protected conduct closely followed by adverse action may justify an

inference of retaliatory motive, the mere temporal proximity of Plaintiff's protected

speech to the adverse action is insufficient, without more, to establish retaliatory

motive."  *Couch*, 587 F.3d at 1236 (quoting *Baca v. Sklar,* 398 F.3d 1210, 1221 (10th

Cir. 2005)).  "It might be relevant in establishing a retaliatory motive that 'the employer

expressed opposition to the employee's speech,' . . . or that 'the protected speech

implicated the individual defendant in wrongdoing.'"  *Id.* (quoting *Maestas,* 416 F.3d at

1189; *Baca,* 398 F.3d at 1221).  However, "evidence such as a long delay between the

employee's speech and challenged conduct, or evidence of intervening events, tend to undermine any inference of retaliatory motive and weaken the causal link." *Id.* (quoting *Maestas,* 416 F.3d at 1189). "Although causation is ordinarily a factual question in this context, 'summary judgment is appropriate when there simply is no evidence in the record from which a trier of fact could reasonably conclude the protected speech was a motivating factor' in the challenged action." *AH Aero Servs., LLC v. Heber City*, 601 F. Supp. 3d 1157, 1184 (D. Utah 2022) (quoting *Cypert v. Indep. Sch. Dist. No. I-050 of Osage Cnty.*, 661 F.3d 477, 484 (10th Cir. 2011)).

Dr. Calderón maintains that she has created a dispute of material fact as to whether Mr. Vigil, Ms. Huerter, and Mayor Hancock were motivated by her speech to award the TJC contract to Servicios and thereby terminate her position. *See* Docket No. 156 at 13-16. In her statement of additional disputed facts, Dr. Calderón asserts that, after she began criticizing Sheriff Firman and Mayor Hancock, Ms. Huerter, who oversaw the CRP contract, told Dr. Calderón that she needed to stop speaking out publicly about jail discrimination issues. *Id.* at 7, ¶ 12. Ms. Huerter selected the panel members to review the bids for the reentry contract and make a recommendation to the CPCC. *Id.* at 8, ¶ 13.[27] Ms. Huerter selected Del Philips to serve on the review panel. *Id.* Mr. Philips had written a letter supporting Servicios as a potential contractor. *Id.* Dr. Calderón argues that these facts are sufficient to demonstrate that Ms. Huerter's actions were motivated by Dr. Calderón's speech. *Id.* at 15. Based on Dr. Calderón's assertions that Ms. Huerter warned Dr. Calderón about further criticizing the city and

---

[27] Dr. Calderón includes two paragraphs numbered thirteen and no paragraph numbered fourteen. *See* Docket No. 156 at 7-8.

that Ms. Huerter appointed a proponent of a different organization to the review panel,

Dr. Calderón has created a dispute of fact as to whether Ms. Huerter was motivated to

terminate Dr. Calderón because of her speech.

    Dr. Calderón argues that her evidence indicates that Mr. Vigil and Ms. Albo were

also motivated to terminate Dr. Calderón because of her speech. *Id.* at 13-14.  Dr.

Calderón relies on Ms. Siman's testimony that Mr. Vigil told Ms. Siman that Denver

employees were attempting to find a legitimate reason to terminate Dr. Calderón's

contract and that he believed that Dr. Calderón "had brought the action upon herself

because of the way she had been behaving."  Docket No. 148 at 5, ¶ 21; Docket No.

156 at 6, ¶ 7.  It is not clear to the Court whether Mr. Vigil's comment about Dr.

Calderón's behavior is a reference to her criticism of Mayor Hancock and Sheriff Firman

or a reference to something else.  Moreover, neither Ms. Siman's testimony nor Mr.

Vigil's statement indicates that Mr. Vigil personally took any action to disadvantage Dr.

Calderón in the RFP process or that Mr. Vigil's opinion regarding Dr. Calderón's

behavior was shared by other employees.  Nevertheless, viewed in the light most

favorable to Dr. Calderón, the Court finds that Ms. Siman's and Mr. Vigil's testimony is

sufficient to create a dispute of fact as to whether certain Denver employees, including

Mr. Vigil and Ms. Albo, were motivated to find a way to end Dr. Calderón's employment

with the city because of her speech.  The Court rejects defendants' argument that,

because Mr. Vigil shared with Ms. Siman his personal opinion, Dr. Calderón has not

created a dispute of fact.  Docket No. 148 at 13-14.  Defendants do not explain why it

material that Mr. Vigil expressed a personal opinion or why his testimony is not

evidence of the motivation of Denver employees to terminate Dr. Calderón's contract.

*See Jackson v. Loc. Union No. 211 of United Steel, Paper & Forestry, Rubber, Mfg.,
Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO-CLC*, 2009 WL 10704345, at
*4 (N.D. Ala. Nov. 2, 2009) (denying motion in limine to exclude any "reference by any
person regarding their opinion as to the reasons for the action of the Executive Board or
[the Local Union] at any point in time" because, although the "testimony of a witness
regarding the motives or thoughts of another person or body" could be speculative, "a
witness's opinion testimony could potentially be admissible under Rule 701, depending
on the circumstances").

Finally, Dr. Calderón argues that she has created a dispute of fact as to whether
Mayor Hancock was motivated to terminate her because of her criticism.  Docket No.
156 at 15.  It is undisputed that Mayor Hancock was upset and personally offended by
Dr. Calderón's criticism.  Docket No. 148 at 7, ¶ 31.  The Court agrees that Mayor
Hancock's awareness of Dr. Calderón's criticisms of him and of Sheriff Firman, as well
as his negative reaction to her public comments, create a dispute of fact as to whether
he may have been motivated to end Dr. Calderón's contract with the city because of her
speech.

Defendants respond that, regardless of the motivation of any particular individual,
Dr. Calderón cannot establish a causal link between her speech and Servicios receiving
the TJC contract.  Docket No. 148 at 11.  They maintain that Dr. Calderón cannot show
that her protected speech was a motivating factor for the people who decided not to
renew the CPR contract or that Denver would not have made the same decision without
Dr. Calderón's speech.  *See id.*  Defendants rely on the undisputed facts that both the
review panel and the CPCC independently reviewed the bids for the TJC contract and

recommended that Servicios receive the contract.  First, a review panel recommended both CPR and Servicios as finalists for the contract.  *Id.* at 3-4, 11, ¶ 13.  Next, the CPCC voted to recommend to the executive director of DHS, Mr. Mares, that the contract be awarded to Servicios.  *Id.* at 4, ¶ 14.  Defendants assert that, to demonstrate retaliatory motive on behalf of these committees, Dr. Calderón must show "that the majority of the committee members were biased because of her speech or that a biased member exerted substantial influence over the committee's decision."  *Id.* at 12; *see also Couch*, 587 F.3d at 1241 ("because the decision-maker was a committee, Dr. Couch would need to establish that a majority of the members who voted on action were biased or that a biased member was a substantial influence over the committee's ultimate action in order to satisfy his burden to establish causation"); *Price v. Bavaria Inn Rest., Inc.*, No. 17-cv-03000-PAB-NYW, 2019 WL 6215640, at *5 (D. Colo. Nov. 21, 2019) (same).

Defendants maintain that only Ms. Huerter was "involved with the Review Panel or the CPCC" and that "there is no evidence that she attempted to steer either the Review Panel or the CPCC towards or away from any bidder."  Docket No. 148 at 12.  Dr. Calderón argues that she has created a dispute of material fact as to whether "the contracting process was 'rigged' against Dr. Calderón."  Docket No. 156 at 17-18.  Dr. Calderón maintains that she can demonstrate the review panel was biased because Ms. Huerter, who instructed Dr. Calderón to stop criticizing the city, appointed a CPCC member to the review panel who was also a vocal supporter of Servicios.  *Id.*  She asserts that the CPCC vote is suspect because Sheriff Firman and Mr. Philips participated in the executive session before the vote on the TJC services contract,

although Dr. Calderón acknowledges that these individuals later recused themselves.[28]
*Id.* at 18.

The Court finds that Dr. Calderón has not shown that the CPCC's recommendation to award the TJC contract to Servicios was tainted by retaliatory animus. The only undisputed facts concerning the CPCC vote are that (1) the CPCC consists of thirty-three individual members, (2) three of these members recused themselves from the vote, (3) CRP received nine votes, and (4) Servicios received 11 votes. Docket No. 148 at 1, 4-6, ¶¶ 2, 14, 26. Dr. Calderón cites no evidence, disputed or undisputed, as to why Servicios would not have received more votes than CRP in the absence of her speech. Her evidence that biased members of the community participated in the executive session before recusing themselves from the vote is insufficient to demonstrate that the results of the vote were biased against Dr. Calderón. *See Xu v. Denver Pub. Sch.*, No. 20-cv-3774-RMR-SKC, 2023 WL 2570246, at *5 (D. Colo. Feb. 22, 2023) ("The Plaintiff's mere speculation about Salem's influence is not enough to demonstrate a genuine issue of material fact." (citing *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1320–21 (10th Cir. 1999), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) (plaintiff's speculation that the supervisor who allegedly had retaliatory animus may have influenced interviewers was insufficient to establish causal connection because "evidence of an opportunity to influence does not amount to evidence of actual influence"))), *aff'd*, 2024 WL 448290

---

[28] Dr. Calderón's argument focuses on Ms. Huerter rather than on Mr. Vigil and Ms. Albo. *See* Docket No. 158 at 13-16. The Court finds that, regardless of Dr. Calderón's evidence of a retaliatory motive on the part of Mr. Vigil and Ms. Albo, she produces no facts showing that Mr. Vigil and Ms. Albo took actions that disadvantaged her in the RFP process.

(10th Cir. Feb. 6, 2024) (unpublished); *Price*, 2019 WL 6215640, at *5 ("setting aside

the votes of Ms. Poague and Ms. Mondale, there were still five managers for whom

there is no evidence of knowledge of the protected activity and no evidence of a

retaliatory animus" (citing *Goodmaster v. Town of Seymour*, 2016 WL 10452427, at *13

(D. Conn. Feb. 8, 2016) ("Even if the court were to presume that [the one defendant]

voted . . . based on a retaliatory animus, there still would have been four votes denying

the request on permissible grounds.  As such, [defendants] as a whole escape

liability.")))

        For the same reasons, Dr. Calderón's arguments regarding the review panel are

unpersuasive.  At most, Dr. Calderón has raised an inference that Ms. Huerter

appointed Mr. Philips to the review panel in retaliation for Dr. Calderón's speech

because he was a proponent of the Servicios bid.  Dr. Calderón provides no support for

the proposition that the Court should consider Mr. Philips's advocacy for Servicios as

evidence of retaliatory animus against Dr. Calderón for her speech.  Even if the Court

were to consider Mr. Philip's appointment as retaliation against Dr. Calderón's speech,

the review panel consisted of eight community members.  Docket No. 148 at 3-4, ¶ 13.

Dr. Calderón includes no facts regarding any retaliatory intent on behalf of the other

members of the review panel.  *See Goodmaster*, 2016 WL 10452427, at *13.

Therefore, the Court finds that Dr. Calderón has failed to produce evidence that is

sufficient to raise an inference that the recommendations of the review panel or the

CPCC were motivated by retaliatory animus.  As such, Dr. Calderón cannot show that,

but for her speech, she would have been awarded the TJC contract.

Defendants assert that, even if the review panel's and the CPCC's recommendations were tainted by retaliatory animus, per the RFP, Mr. Mares had final authority over awarding the TJC contract. Docket No. 148 at 12. An employer can "break the causal chain" between a biased subordinate's unconstitutional actions and the adverse employment action by independently reviewing and approving the action. *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 516-17 (10th Cir. 2015); *see also Couch*, 587 F.3d at 1242 ("Under the circumstances here, where the committee's action was merely a recommendation for a higher committee to take certain action, and where the higher committee conducts independent reviews of lower committee's actions, a reasonable person would not be deterred from further speech."); *Parker v. United Airlines, Inc.*, 49 F.4th 1331, 1335 (10th Cir. 2022) (the requisite causal link for retaliation claim is broken when an independent decisionmaker conducts investigation and decides to fire employee); *Szeto v. Univ. of Colo. by & through Regents of Univ. of Colo.*, 767 F. Supp. 3d 1102, 1111 (D. Colo. 2025) (same). Defendants claim that plaintiff has produced no evidence that Mr. Mares was aware of her speech when he chose Servicios as the winning bidder. Docket No. 148 at 12. As such, they claim that Dr. Calderón has failed to show that her speech motivated Mr. Mares's decision to award the contract to Servicios. *Id.*

Dr. Calderón does not respond to defendants' argument that Mr. Mares was unbiased, and she cites no evidence that Mr. Mares was biased. *See* Docket No. 158 at 13-16. Dr. Calderón has adduced no facts from which a reasonable jury could conclude that Mr. Mares, the executive director of DHS, chose to award the TJC contract to Servicios as retaliation against Dr. Calderón for her protected speech, or that

he was aware of her speech.  Therefore, the Court finds that Dr. Calderón has not
shown that her protected speech was a motivating factor in Mr. Mares's decision.  Mr.
Mares's independent decision to award Servicios the TJC contract is a second basis to
conclude that Dr. Calderón's speech was not a substantial motivating factor for
Denver's adverse employment action.

       Rather than trying to create a genuine issue of material fact regarding Mr.
Mares's bias, Dr. Calderón maintains that Mayor Hancock "is the final authority on all
City contracts," that he "signed the contract with the new reentry provider," and that he
was biased against Dr. Calderón because of her criticism of him.  *Id.* at 16, 18.  Even if
the Court were to assume that Mr. Mares reported to Mayor Hancock, nothing in the
record suggests that Mayor Hancock attempted to influence Mr. Mares's decision.
Moreover, there are no facts indicating that Mayor Hancock had the authority to override
Mr. Mares's decision of which proposal to declare as the winning bid of the RFP
process.  The Court does not find the fact that Mayor Hancock signed the Servicios
contract to be sufficient to create a dispute of material fact that Mayor Hancock had final
decision-making authority over which organization would be awarded the TJC contract.
As defendants point out, the Denver city charter states that "[a]ll contracts or other
instruments of writing, requiring the assent of the City and County, shall be subscribed
by the Mayor, or acting Mayor, as the case may be, under the seal of the City and
County, and attested by the Clerk."  Denver, Colo., Mun. Code § 2.2.4; Docket No. 148
at 5, ¶ 20.  Dr. Calderón provides no facts to suggest that Mayor Hancock's signature
was more than a perfunctory and ministerial requirement of executing a contract with
the city.  Instead, it is undisputed that the RFP states that Mr. Mares would make the

final determination of the successful proposers and the dollar amount of the contracts. Docket No. 148 at 3, ¶ 9. Moreover, Dr. Calderón produces no facts to demonstrate why Mayor Hancock would have selected CDNC but for Dr. Calderón's criticism of him.

Lastly, Dr. Calderón argues that the temporal proximity between her speech and the modifications to the RFP process indicates that the CRP program was ended because of Dr. Calderón's criticisms of the city. Docket No. 156 at 11, 15-16. She asserts that the CRP contract to provide reentry services was not reviewed for eight years, and that it was not until Dr. Calderón began to criticize Mayor Hancock, Sheriff Firman, and Denver's custodial policies that an RFP was published. *Id.* Specifically, Dr. Calderón claims that, because of Dr. Calderón's criticism of the city, Ms. Huerter chose to amend the RFP so that it requested bids for a different organization to take over CRP's contract to provide TJC services.[29] *Id.* at 5-6, ¶¶ 3, 8. Dr. Calderón's argument appears to be that defendants retaliated against her by putting the CRP contract up for bid, regardless of whether the bid process was fair. However, the Tenth Circuit has held that an employer can break the chain of causation by showing that a neutral final decision maker approved the allegedly retaliatory action. *See Parker*, 49 F.4th at 1335. Because Dr. Calderón has failed to show that there is a dispute of material fact as to whether Dr. Calderón's speech was a substantial motivating factor in decisions of the review panel, the CPCC, and the executive director of DHS, the Court

---

[29] Dr. Calderón asserts that in 2016 Ms. Huerter "decided to put out an RFP for the reentry program" and "that – like the 9 previous years – the contract would be for another fiscal agent to provide administrative services to CRP." Docket No. 156 at 5, ¶ 3. However, Dr. Calderón claims, after her criticism of the city, the RFP that was issued "sought a third-party entity to both provide services and do the administrative work, eliminating the City CRP project." *Id.* at 6, ¶ 8.

finds that no reasonable juror would conclude that CRP not being selected to provide TJC services was caused by Dr. Calderón's speech.  Therefore, the Court will grant defendants' motion for summary judgment on Dr. Calderón's free speech claim to the extent it is based on the RFP process and the awarding of the Servicios contract.

## 2. *Investigation*

Defendants argue that Dr. Calderón cannot prove her First Amendment retaliation claim based on the allegedly retaliatory investigation that occurred in 2021 when she worked for City Councilwoman CdeBaca.  Docket No. 148 at 19-20. Defendants maintain that there are no facts connecting the individual defendants to this investigation.  *Id.* at 20.  Dr. Calderón does not respond to this argument.  *See* Docket No. 156 at 18-19.  The Court agrees that Dr. Calderón has failed to connect the individual defendants to the investigation.

In her statement of additional disputed facts, Dr. Calderón asserts that Murphy Robinson, the executive director of the Department of Public Safety, filed a complaint against Dr. Calderón based on her comments to Mr. Saldate.  Docket No. 156 at 8, ¶ 16; *see also* Docket No. 148 at 8, ¶¶ 37-39.  It is undisputed that Mr. Flynn investigated whether her comments violated the Denver City Council Respectful Workplace Policy.  Docket No. 148 at 8-9, ¶ 40.  None of these individuals is a defendant in this case, and Dr. Calderón includes no facts demonstrating that Mayor Hancock, Mr. Vigil, Ms. Albo, or Ms. Huerter participated in the investigation.  Therefore, Dr. Calderón has failed to create a genuine dispute of material fact regarding the causation element of her First Amendment retaliation claim as to any of the individual defendants.

Defendants argue that Denver cannot be held liable for the 2021 investigation under a theory of municipal liability.  *Id.* at 20.  Municipalities may not be sued under 42 U.S.C. § 1983 on a theory of respondeat superior for the actions of their employees. *Monell v. Dep't of Soc. Servs. Of City of N.Y.,* 436 U.S. 658, 692 (1978).  Instead, local governing bodies can be sued directly only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Id*. at 690.  "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id*. at 694.

To state a claim of municipal liability under § 1983 for the actions of municipal employees, a plaintiff must allege sufficient facts to demonstrate that it is plausible (1) that the municipal employees committed a constitutional violation and (2) that a municipal policy or custom was the moving force behind the deprivation of rights.  *See Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004).  A municipal policy or custom can take the form of:

> (1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

Defendants argue that Dr. Calderón has produced no evidence that a Denver policy or custom was the moving force behind the allegedly unconstitutional investigation.  Docket No. 148 at 20.  Dr. Calderón argues that "the highest level of authority in the Department of Public Safety, Murphy Robinson, initiated the investigation of Dr. Calderón."[30]  Docket No. 156 at 19.  Dr. Calderón provides no support for the proposition that Mr. Robinson, as the executive director of the Denver Department of Public Safety, had final policy-making authority over either the Denver City Council Respectful Workplace Policy or over investigations into violations of such policies.  Because this is Dr. Calderón's only argument as to how the investigation was the product of an official Denver policy, the Court finds that Dr. Calderón has failed to prove that Denver is liable for the allegedly retaliatory investigation.  Therefore, the Court will grant defendants' motion for summary judgment on Dr. Calderón's first claim.[31]

---

[30] Dr. Calderón also claims that "the Mayor's chief of staff was copied on the progress of the investigation."  Docket No. 156 at 19.  This fact does not appear in either the parties' undisputed facts or Dr. Calderón's statement of additional disputed facts.  Moreover, Dr. Calderón cites no support in the record for this assertion.  Therefore, the Court will not consider this fact.

[31] Both Dr. Calderón's complaint and her response refer to the fact that Mr. Vigil and Ms. Albo shared a rumor that she was having a romantic relationship with someone other than Dr. Calderón's partner, which she characterizes as "City-generated rumors about sexual misconduct."  Docket No. 156 at 10.  However, Dr. Calderón presents no argument as to why this constitutes retaliation under the First Amendment.  *See id.* at 12 n.2.  Therefore, the Court will not consider whether Mr. Vigil's and Ms. Albo's conduct violated Dr. Calderón's constitutional rights.  *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("The court will not consider . . . issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation.") (internal quotations and citation omitted).  Even if the Court were to consider Dr. Calderón's assertions of fact on this issue, Dr. Calderón fails to produce any evidence that Mr. Vigil's and Ms. Albo's comments about Dr. Calderón's alleged romantic relationship were motivated by the criticism of Sheriff Firman or Mayor Hancock identified in Dr. Calderón's response.  Moreover, there is no evidence that Mr. Vigil and

### B. **Conspiracy**

A plaintiff asserting a § 1983 conspiracy claim must prove that she was "(1) deprived of a constitutional right (2) by a conspiracy comprised of or including conspirators acting under color of state law." *Moses-El v. City & Cnty. of Denver*, 2022 WL 1741944, at *17 (10th Cir. May 31, 2022) (citing *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir. 1990). A "conspiracy claim allows for imputed liability; a plaintiff may be able to impose liability on one defendant for the actions of another performed in the course of the conspiracy." *Bledsoe v. Carreno*, 53 F.4th 589, 609 (10th Cir. 2022) (citation omitted). However, "[b]oth elements are essential" because the "essence of a § 1983 claim is the deprivation of the right rather than the conspiracy." *Moses-El*, 2022 WL 1741944, at *17.

Dr. Calderón argues that there "is sufficient evidence to create a genuine issue of material fact as to whether City defendants conspired to deprive Dr. Calderón of her constitutional rights under the First Amendment." Docket No. 156 at 17. She maintains that "defendant Vigil admitted to Shelly Siman that he and defendants Huerter and Albo emailed each other about terminating the contract under which Dr. Calderón worked so that she would lose her job because of her speech." *Id.* "Further, there is no dispute that defendant Huerter took an action in furtherance of that objective when she drafted and processed the RFP that eliminated the CRP and replaced it with an outside provider." *Id.*

---

Ms. Albo sharing rumors about Dr. Calderón disadvantaged her during the RFP process. Therefore, Dr. Calderón's has not produced evidence to create an inference of the fourth and fifth elements of her retaliation claim based on Mr. Vigil and Ms. Albo spreading gossip about Dr. Calderón.

To the extent that Dr. Calderón's conspiracy claim is based on the alleged
retaliation of eliminating the CRP program, the Court has found that Dr. Calderón has
failed to demonstrate that there is a dispute of material fact as to whether defendants
deprived Dr. Calderón of her First Amendment rights.  Therefore, Dr. Calderón has
failed to create an inference on the first element of her § 1983 conspiracy claim.  To the
extent that Dr. Calderón's conspiracy claim is based on the workplace investigation, Dr.
Calderón includes no facts that demonstrate that any defendant agreed to deprive Dr.
Calderón of her constitutional rights by investigating her for violating the Work Place
policy.  *See id.* at 5-9, ¶¶ 1-21.  Dr. Calderón has therefore failed to show that there is a
dispute of material fact as to the second element of her conspiracy claim.  Accordingly,
the Court will grant defendants' motion for summary judgment and dismiss Dr.
Calderón's claims with prejudice.

## IV.    CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Plaintiff's Motion for Leave to File Surreply Regarding
Defendants' Motion for Summary Judgment [Docket No. 165] is **GRANTED**.  It is further

**ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 148] is
**GRANTED**.  It is further

**ORDERED** that plaintiff's first and second claims are **DISMISSED with
prejudice**.  It is further

**ORDERED** that this case is closed.

DATED September 25, 2025.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge